# IN THE SUPREME COURT OF TEXAS

═══════════
No. 15-0056
═══════════

WADE BRADY, PETITIONER,

v.

LEAANNE KLENTZMAN AND CARTER PUBLICATIONS, INC. D/B/A THE WEST FORT
BEND STAR, INC., RESPONDENTS

══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
══════════════════════════════════════════════════════

**Argued September 13, 2016**

JUSTICE DEVINE delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE BOYD joined.

CHIEF JUSTICE HECHT filed a dissenting opinion, in which JUSTICE GREEN, JUSTICE WILLETT, and JUSTICE BROWN joined.

Lest fear of damages dampen speech on public matters, the First Amendment imposes safeguards for defendants in defamation cases. For example, a private individual who sues a media defendant for defamation over statements of public concern must prove the statements were false. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986). Further, to recover punitive damages, such a plaintiff must prove the defendant acted with "knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974). Yet in this defamation case, the trial court awarded actual damages against a newspaper defendant without

requiring the plaintiff to prove the newspaper's statements were false. Moreover, the court awarded punitive damages without a finding that the newspaper knew the statements were false or was reckless regarding their falsity. The court of appeals—holding the article covered a matter of public concern—reversed and remanded for a new trial, so the jury could evaluate the evidence under the proper standard. 456 S.W.3d 239, 266–67 (Tex. App.—Houston [1st Dist.] 2014). We affirm.

I

Wade Brady disputes a newspaper article that, among other things, portrayed him as "unruly and intoxicated" when he interacted with a State Trooper. The article, written by LeaAnne Klentzman for the West Fort Bend Star, described actions taken by Wade's father, the Chief Deputy for the Fort Bend County Sheriff's office, after Wade was ticketed and charged with being a minor in possession of alcohol. Klentzman reported that Chief Brady "continually made contact with the officers" who ticketed his son. The officers "were intimidated," Klentzman wrote, when Chief Brady "demanded any and all audio tapes or notes from that incident in their possession." Although these meetings eventually stopped, Klentzman reported that personnel in the sheriff's office were "wondering when the other shoe will drop."

Klentzman's article chronicled three encounters between Wade and law enforcement. First, the article identified Wade as

> the same son [of Chief Brady] who stated that he loaned his cell phone to a stranger who then absconded with it. The alleged robbery resulted in a police pursuit through the streets of Rosenberg with the chief deputy driving his unmarked police car in the pursuit with his then 16-year-old son and friend in the vehicle. The pursuit ended when the alleged robber crashed his car into someone's property.

> Second, Klentzman recounted the events leading to Wade's minor-in-possession charge:

2

According to testimony in the August trial of Wade Brady, in February of 2001, Wade had to travel to Galveston and pick up his brother, Cullen, and a friend after they had been involved in an automobile accident on the beach during Mardi Gras festivities. Upon arrival at the beach, Wade and his friend loaded the beverage-laden coolers from Cullen's vehicle to his own. The group then headed back to Rosenberg.

According to Cullen's testimony, he forgot to unload the cooler of alcoholic beverages from Wade's truck after they arrived home from the beach. The next day, Wade and a friend were stopped by deputies from the sheriff's office on State 99 (Grand Parkway) for littering. Again, according to testimony, an officer said that during the traffic stop they smelled what they believed to be alcohol in the cab area of the truck. Wade Brady was ticketed for MIP (minor in possession of alcohol).

. . . What makes this case unique is that the father of Wade Brady, Fort Bend County Sheriff's Department Chief Deputy Craig Brady, continually made contact with the officers involved.

Finally, the article reported that during one of Chief Brady's meetings with the officers who ticketed Wade,

another incident with Wade and Cullen Brady was unfolding in the Chief's driveway. Brady's sons had led a DPS Trooper from the streets of Rosenberg winding down narrow roads all the way to their riverside home.

In the DPS video tape viewed by the *Star* and then later obtained through the Freedom of Information Act, Wade Brady was so unruly and intoxicated that the Trooper had to handcuff him and place him in the backseat of the police car for safety. . . . Finally the Trooper admonished [them] and let them go into their home.

. . . Sheriff Milton Wright [could] be heard on the tape alerting Chief Brady over the county's official radio system that he (Brady) needed to get home where "an incident" was occurring. . . . Oddly, the county's dispatcher can be heard attempting not to broadcast Cullen Brady's name when the trooper asked for information.

In light of these events, Klentzman concluded "it should be glaringly apparent why the officers [who ticketed Wade] were intimidated" by Chief Brady's actions.

Wade sued Klentzman and the West Fort Bend Star (collectively referred to as the media defendants) for libel and libel per se. He alleged the "article was a malicious attempt to portray Wade Brady as a criminal and as someone who used his father's connections to skirt the charges

3

filed against him." According to Wade, Klentzman "consciously ignored the truth in preparing the story," omitting some facts and fabricating others. For example, Wade emphasizes that the article never disclosed he was acquitted of the minor-in-possession charge.

At trial, the jury found that at least some statements in Klentzman's article were defamatory. The jury found also that at least some of the statements were not substantially true, having been charged that "the Defendants have the burden to prove substantial truth by a preponderance of the evidence." Although the jury concluded that Klentzman acted with "malice," there was no finding that she acted with knowledge of falsity or reckless disregard for the truth. Instead, "malice" was defined as:

> (a) A specific intent . . . to cause substantial injury to Plaintiff Wade Brady; or
>
> (b)     An act or omission by [the defendant],
>     (i)     Which when viewed objectively from the standpoint of [the defendant] at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others;
>     (ii)     of which [the defendant] has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

In other words, "malice" was defined to require intent to cause injury or conscious indifference of the risk.

The jury assessed $50,000 in damages against the media defendants for mental anguish and damage to Wade's reputation. It also assessed $30,000 in exemplary damages against Klentzman and $1,000,000 in exemplary damages against the Star. After reducing the exemplary damages against the Star to $200,000, the trial court rendered judgment on the verdict.

4

The media defendants appealed, arguing, among other things, that the jury charge improperly placed the burden of proving truth on the defendants and allowed the plaintiff to recover punitive damages without proving actual malice. They asserted also that no evidence supported the damages awarded for mental anguish and reputational harm.

The court of appeals agreed the jury charge was erroneous. It reversed and remanded for a new trial, holding that (1) Wade bore the burden of proving the defamatory statements were false; (2) to recover exemplary damages, Wade had to show the media defendants acted with knowledge of the statements' falsity or reckless disregard for the truth; and (3) legally sufficient evidence exists that Wade suffered actual damages. 456 S.W.3d at 266–68. The court also concluded that the article's gist concerned Chief Brady's activities on Wade's behalf, rather than Wade's misdeeds, and that these activities and the details about Wade's various interactions with law enforcement were matters of public concern. *Id.* at 260–62.

Both Wade and the media defendants have filed petitions for review. Wade contends that the court of appeals should have affirmed the trial court's judgment because no charge error exists. The media defendants argue that the appellate court correctly reversed the trial court's judgment but erroneously remanded the case for a new trial because Wade presented no evidence of damages.

II

Because the asserted defamation is part of a newspaper story, the threshold question is whether the article wholly embraces matters of public concern. More specifically, we must decide whether Wade's encounters with the police were matters of public concern. The answer determines whether the jury charge complied with First Amendment standards. For example, although falsity

was not an element of defamation at common law, the First Amendment requires private individuals to prove that statements made by media defendants on matters of public concern are false. *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 711 (Tex. 2016). But here the jury charge required the media defendants to prove their statements were true instead of demanding that Wade prove them false.

The First Amendment also requires that a private plaintiff prove actual malice, that is, "knowledge of falsity or reckless disregard for the truth," before recovering anything more than actual damages for a statement on a matter of public concern. *Gertz*, 418 U.S. at 349–50. But here "malice" in the jury charge referred only to an intent to cause injury or conscious indifference to the risk of injury; it was not tied to the truth or falsity of the statements. Because "the constitutional focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff," *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016), proof of bad motive or ill will is not enough. Thus, in addition to proving the traditional "malice" required to obtain exemplary damages under Texas law,[1] one seeking exemplary damages for speech on a public matter must also prove constitutional "actual malice."[2]

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 41.003 (conditioning exemplary damages on proof by "clear and convincing evidence" of fraud, malice, or gross negligence); *see also id.* § 41.001(7) (defining "malice" as "a specific intent by the defendant to cause substantial injury or harm to the claimant").

[2] At times, "actual malice" may evidence traditional malice. *See, e.g.*, *Bentley v. Bunton*, 94 S.W.3d 561, 604–05 (Tex. 2002) ("[B]ecause the defendants acted with actual malice, Bentley is entitled to punitive damages without proving that the defendants were personally vindictive toward him . . . ."); *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374–75 (Tex. 1984) (holding that evidence of disregard of blatant untruth and gratuitous spreading of the untruth were circumstantial evidence of malice). But evidence of actual malice alone does not relieve the plaintiff of proving traditional malice also to obtain punitive damages under Texas law.

What then is a matter of public concern? According to the Supreme Court, speech "deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Public matters include "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* (quoting *San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam). Whether "speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (plurality opinion) (alterations in original) (quoting *Connick*, 461 U.S. at 147–48).

Public matters include, among other things, "commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975). A report that a corporation and its principal stockholder "had links to organized crime and used some of those links to influence the State's governmental process" was a matter of public concern. *Hepps*, 475 U.S. at 769. Similarly, the "disclosure of misbehavior by public officials is a matter of public interest . . . , especially when it concerns the operation of a police department." *Brawner v. City of Richardson*, 855 F.2d 187, 191–92 (5th Cir. 1988) (footnotes omitted); *see also Kinney v. Weaver*, 367 F.3d 337, 361 (5th Cir. 2004) (en banc) (emphasizing "the great First Amendment significance of speech bearing on official misconduct").

Here, Klentzman reported that Chief Brady "intimidated" the officers who ticketed Wade, and she described Chief Brady's various interactions with these officers. Clearly, Chief Brady's response to the officers who ticketed his son is a matter of public concern. There is a "paramount

7

public interest in a free flow of information to the people concerning public officials" such as Chief Brady. *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964); *see Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) (stating that "public officials" include "those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs"). It is "a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (quoting *San Diego*, 543 U.S. at 83-84).

Wade, however, argues that individual statements in the article were not public matters. For example, the article recounts Chief Brady's pursuit of someone who stole Wade's cell phone. Because this incident happened nearly three years before Klentzman wrote her article, Wade argues it was not timely or newsworthy. Similarly, Wade challenges Klentzman's report about the incident with the DPS Trooper who followed Wade and his brother home one evening. Klentzman's article states that, while the Trooper questioned Wade's brother about his driving and alcohol consumption, Wade "was so unruly and intoxicated that the Trooper had to handcuff him and place him in the backseat of the police car." Wade denies that he was unruly or intoxicated. Moreover, Wade argues the incident is not logically related to the public issue of his father's meetings with other officers because Chief Brady was not present. Instead, Wade asserts Klentzman described these incidents merely to embarrass him publicly.

We have recognized that even if "the general subject matter of a publication may be a matter of legitimate public concern," some of the details may not be. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 474 (Tex. 1995). But if a "logical nexus" exists between these details "and the general subject matter" of the article, then they are reasonably included as a matter of public concern. *Cf.*

8

*id.* (discussing whether details about a rape victim's identity were a matter of legitimate public concern).

Wade's encounters with law enforcement directly relate to the general subject matter of Klentzman's article: Chief Brady's use of authority on Wade's behalf. Whether appropriate or not, Chief Brady's pursuit of someone who stole Wade's cell phone describes him intervening on Wade's behalf. And that Wade was reportedly "so unruly and intoxicated that [a] Trooper had to handcuff him" suggests Wade's run-ins with the police are not isolated instances; they may continue to test Chief Brady in the future. Courts have declined "to get involved in deciding the newsworthiness of specific details in a newsworthy story where the details were 'substantially related' to the story." *Lowe v. Hearst Commc'ns, Inc.*, 487 F.3d 246, 251 (5th Cir. 2007). Nor should courts "make editorial decisions for the media regarding information directly related to matters of public concern." *Cinel v. Connick*, 15 F.3d 1338, 1346 (5th Cir. 1994).

But Wade emphasizes that parts of Klentzman's article were false. Indeed, while addressing another issue, the court of appeals concluded the article "omitted . . . key information" and "was not a fair, true, and complete account as it related to Wade." 456 S.W.3d at 253. But the truth or falsity of these details does not change that they are a matter of public concern and thus does not affect Wade's burden under the First Amendment.

Accordingly, the trial court erred. The complained-of statements were a matter of public concern, but the jury charge did not require Wade to prove them false. Neither did it require him to establish actual malice before obtaining punitive damages. The media defendants objected to the charge on these grounds. Indeed, they went further, submitting in writing proposed questions

9

requiring Wade to prove falsity and actual malice. The media defendants raised the same point before the court of appeals, arguing that Wade had to prove falsity and actual malice because the article "reported on a matter of public concern." The media defendants have preserved error, and the error is reversible. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 44 (Tex. 2007) (holding that where "a proper objection is made about the omission of an essential element, the failure to include it is reversible error"). The court of appeals properly reversed the judgment in Wade's favor. 456 S.W.3d at 270.

III

Because the jury charge was defective, the court of appeals remanded the case for a new trial. 456 S.W.3d at 267, 270. The media defendants assert the court of appeals should have done more: it should have rendered judgment in their favor because no evidence exists of damages, an essential element of Wade's claim. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009) ("Ordinarily, we render judgment when we sustain a no evidence issue."). The jury awarded $20,000 for mental anguish damages and $30,000 for loss of reputation, but the media defendants argue no evidence exists of either.

Damages, however, are not always an essential element of defamation. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) ("Defamation's elements include . . . damages, *in some cases*.") (emphasis added). If the statement is defamatory *per se*, then nominal damages may be awarded without proof of actual injury because mental anguish and loss of reputation are presumed. *Id*. at 596. Of course, if the plaintiff seeks actual damages for loss of reputation or mental anguish (general damages) or for economic loss (special damages), he must present evidence of the existence and

10

amount of these damages. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014); *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). But this is optional. The plaintiff can vindicate his name and obtain nominal damages without evidence of actual injury. *See In re Lipsky*, 460 S.W.3d at 596 (noting that "actual damage is not an essential element of [a defamation *per se*] claim."[3]

In contrast, if the statement is not defamatory *per se*, then nominal damages are not recoverable, and the plaintiff must prove actual damages to prevail. *Hancock*, 400 S.W.3d at 65. Absent evidence of actual damages in a case of defamation *per quod*,[4] judgment should be rendered for the defendant. *See id.* at 71–72 (rendering a take-nothing judgment against plaintiff because statements were not defamatory *per se* and there was no evidence of actual damages).

Here, Wade does not address whether the statements in the article were defamatory *per se*. *See In re Lipsky*, 460 S.W.3d at 593 ("Defamation per se refers to statements that are so obviously harmful that general damages [such as mental anguish and loss of reputation] may be presumed.") (citing *Hancock*, 400 S.W.3d at 63–64). His sole argument is that evidence of mental-anguish and loss-of-reputation damages exists in the record. Accordingly, we assume without deciding that actual damages are an essential element of Wade's claim. After reviewing the record, we further conclude that there is some evidence that the newspaper article damaged Wade's reputation.

---

[3] *Lipsky* resolves the "question as to whether . . . nominal damages may be presumed" without evidence of actual injury. *Hancock*, 400 S.W.3d at 65 n.8. They may. *See In re Lipsky*, 460 S.W.3d at 596. Proof of actual injury is required to obtain actual damages for a statement on a matter of public concern lest the "uncontrolled discretion of juries to award damages" chill speech. *Gertz*, 418 U.S. at 349. Nominal damages, traditionally only one dollar, *see Hancock*, 400 S.W.3d at 65, pose no such threat to free expression.

[4] Defamation *per quod* is "[d]efamation that either (1) is not apparent but is proved by extrinsic evidence showing its injurious meaning or (2) is apparent but not a statement that is actionable per se." BLACK'S LAW DICTIONARY 506 (10th ed. 2014); *see also Hancock*, 400 S.W.3d at 63-64 (discussing the distinction between defamation *per quod* and *per se*).

11

Compensatory damages in defamation cases must compensate for *"actual* injuries" and cannot merely be "'a disguised disapproval of the defendant.'" *Burbage*, 447 S.W.3d at 259 (quoting *Bentley*, 94 S.W.3d at 605) (emphasis in original). But when the damages are for non-economic losses, such as mental anguish or lost reputation, the jury must be given some latitude because these general damages are, by their nature, incapable of precise mathematical measure. *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 159–60 (Tex. 2014). Even so, evidence of loss of reputation should be more than theoretical. *Burbage*, 447 S.W.3d at 261. Showing that the community was aware of and discussed the defamatory statements is not enough; there must be evidence that people believed the statements and the plaintiff's reputation was actually affected. *Id.* at 261–62.

Wade presented such evidence. One witness stated that Wade's reputation "back then" "was that he was a good kid." Yet Wade's father testified he had encountered "people in the community that had a negative impression of Wade after this article."[5] Unlike cases in which the evidence did not show "actual loss of reputation" or that "anyone believed the defamation," *id*. at 262; *Hancock*, 400 S.W.3d at 71, here there was express testimony that some people had a low opinion of Wade following the article.

Further, Wade testified that "the first time that [he] really found out" that others were talking about the article "was when my boss asked me to quit my job." Losing a job or business

---

[5] The defendants objected to this testimony as hearsay, but the trial court overruled their objection. When Wade's father named a specific person who "thought poorly of Wade after this article," the defendants objected because the person had not been disclosed as a person with knowledge of relevant facts. The trial court sustained this second objection. But the trial court's ruling on the second objection did not concern the original testimony that some people in the community did think poorly of Wade after the article was published.

12

opportunities, of course, is not evidence of loss of reputation unless the evidence connects it to the defamation. For example, when customers cancelled their business with a funeral home, this was not evidence of loss of reputation because "the cancellations could have occurred for any number of reasons." *Burbage*, 447 S.W.3d at 262. And when a physician's program was not accredited, this was not evidence of harm to his reputation, for "there were multiple possible grounds for" accreditation to be denied. *Hancock*, 400 S.W.3d at 71.

But Wade's case is different. He worked for a company that installed decals on the county's patrol cars. The sheriff testified that after the article appeared, Wade's employer contacted him with concerns about the article. Although the sheriff assured Wade's employer that the company's contract with the county was "safe," the sheriff's testimony demonstrates that the employer was specifically concerned about Klentzman's report. Shortly after these concerns arose, Wade was asked to quit. Thus, at least some evidence suggests Wade was asked to quit because of the article, and this "serve[s] as proof for loss of reputation." *See id*. (observing that special damages may also serve as proof for loss of reputation). Wade later resumed work at the same business, but this does not change that he presented evidence of the article's previous injury to his reputation.

That some people thought less of Wade after the article was published and that his employer asked him to quit his job shortly after reading the article is evidence of damages for loss of reputation. Because some evidence of actual damages exists, the court of appeals properly remanded the case for a new trial instead of rendering judgment in favor of the media defendants.

* * *

13

The court of appeals properly remanded this defamation case for a new trial with a constitutionally compliant jury charge. It also correctly concluded that legally sufficient evidence exists that Wade suffered actual damages. Accordingly, we affirm the court of appeals' judgment.

_____
John P. Devine
Justice

OPINION DELIVERED: January 27, 2017