# Supreme Court of Texas

No. 19-0872

Memorial Hermann Health System,

*Petitioner*,

v.

Miguel A. Gomez, III, M.D. and Miguel A. Gomez, M.D., P.A.,

*Respondents*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued October 28, 2021**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

Justice Bland did not participate in the decision.

After leaving one hospital for a new rival, a pioneering cardiovascular surgeon sued the former for engaging in a retaliatory "whisper campaign" against him. The surgeon alleged that the hospital used faulty data on his patients' mortality rates to suppress competition, injure his reputation, and impair his practice. The jury rejected his anticompetition claims but found that the hospital had defamed him and disparaged his professional association. The hospital's argument that no

evidence supports the jury's defamation and disparagement findings turns on how a reasonable juror would interpret the charge that was given. We hold that the plain text of the charge must be given its commonsense meaning in the context of the case. The court of appeals affirmed the trial court's judgment for the surgeon.[1] We reverse and render.

## I

## A

Dr. Miguel A. Gomez, III, is a cardiovascular surgeon who began practicing at one of Memorial Hermann's Houston campuses, Memorial City, in 1998. He partnered with an established surgeon and pioneered "off-pump" and robotic-assisted heart surgeries. These procedures received media acclaim and were heavily promoted by Memorial Hermann.

But around 2008, things began to change—both internally at Memorial City and externally in the Houston hospital market. Internally, Memorial City initiated data-driven programs aimed at examining and improving patient outcomes. As part of this effort, Memorial City hired Byron Auzenne as the heart and vascular service line leader. Auzenne was not directly involved in patient care. Instead, he served as a "facilitator" to the physicians at Memorial City, providing assistance with—in his words—"pretty much anything that they need[ed] to work at the hospital". Part of Auzenne's new position involved facilitating data collection and analysis for cardiovascular

_____

[1] 584 S.W.3d 590 (Tex. App.—Houston [1st Dist.] 2019).

surgeons.

Patient statistics matter to surgeons and hospitals, who understand what they both do and do not show. A more skilled cardiovascular surgeon may have a higher patient mortality rate than a less skilled surgeon only because of the higher difficulty of surgeries the skilled surgeon takes on. Healthier patients may have better surgical outcomes than those with other health issues. A flawed data sample that fails to take these and other factors into account can produce skewed results that do not accurately reflect a surgeon's quality of care. Surgeons and hospitals know this. The Society of Thoracic Surgeons (STS) adjusts the raw data that it compiles for seven risk-adjusted procedures so as not to compare surgical apples and oranges. Due to concerns over sample variations, STS does not create any type of surgeon-specific mortality rate. The resulting database is a highly valuable resource for hospitals that raw data cannot serve.

A Memorial City physician subcommittee chaired by Gomez recommended that the hospital better utilize STS data and share the data among physicians in the heart and vascular service line. Based on this recommendation and encouragement by the hospital's administration, Memorial City began to create a process for reviewing the underlying data it sent to STS.

Memorial City began with raw, non-risk-adjusted mortality data. Over the summer of 2009, Auzenne met with Memorial City's CEO Keith Alexander and other leaders in the hospital to discuss some initial findings and concerns. Among other things, their review of the raw data showed that Gomez was a "primary driver" of the hospital's "unfavorable

3

mortality rate."

Meanwhile, the Houston hospital market was changing. Methodist Hospital announced plans to open a new hospital campus—Methodist West—just miles from Memorial City. The arrival of this new competitor "registered very high on the radar" of Memorial City's administration, and for good reason. Methodist West's CEO, Wayne Voss, had previously been Memorial City's CEO and had relationships with employees and physicians there. Methodist West quickly began to recruit from Memorial City. Voss approached Gomez about operating at Methodist West. The offer interested Gomez, who was beginning to see a negative "culture change" taking place at Memorial City that he believed was adversely affecting patient care. Gomez's interest in taking at least some of his practice to Methodist West was not a secret.

With Methodist West contemplating a future relationship with Gomez, Jennifer Todd of Memorial Hermann made a call to Cyndi Peña at Methodist West. Broadly stated, Todd's job with Memorial Hermann was to communicate with physicians on behalf of the hospital. Peña had worked with Todd at Memorial Hermann before leaving for Methodist West. Peña's job at Methodist West included recruiting physicians. Todd called to report concerns about Gomez, telling Peña: "I heard bad quality, high mortality rates, unnecessary surgeries." According to Peña, this information was "out there already . . . in the ether," and she had heard similar reports from multiple physicians. Peña reported this information to Methodist West's CEO, Voss. After reviewing Gomez's qualifications, Methodist West hired him to provide surgical services and serve as both the "Co-Director of the Cardiovascular Robotics

4

Institute" and "Senior Advisor for Cardiovascular Surgery Service Development at [the] West Houston [campus]".

Back at Memorial City, Gomez's relationship with the hospital was deteriorating. Word had gotten back to him of the individual surgeon mortality data results. Gomez expressed his concerns to Dr. Rick Ngo, chair of Memorial City's peer review and surgical performance improvement committee, that the raw data did not accurately reflect a surgeon's performance. Ngo shared many of Gomez's misgivings about the data but believed they could be a helpful starting point so long as the hospital used them "the right way with the right methodology." Ngo expressed his concerns to Auzenne and began a peer review of the cases that made up the dataset. While this review was underway, the non-risk-adjusted data were shared at various surgeon and committee meetings. The data were blinded, and an individual surgeon's results were shown only to that individual.

In early 2010, Ngo and the peer review committee completed the peer review of the cardiovascular surgery program. Ngo found no quality-of-care issues among the cardiovascular surgeons, including Gomez. Ngo specifically communicated this finding to the hospital administration and to Gomez. After looking into the data on a case-by-case basis, Ngo concluded that the non-risk-adjusted data presented a flawed picture of a surgeon's quality of care.

Despite this finding, Memorial City continued to collect and use non-risk-adjusted mortality rates as part of its metrics program. According to Gomez, he did not become aware of the hospital's continued reliance on this data until a presentation at a cardiovascular

5

subcommittee meeting in November 2011. There, the presentation again showed blinded individual mortality rates of each surgeon—the same information that Gomez believed was faulty. During the meeting, Gomez objected to the data's use. In response, the presenter told the audience that "only the surgeons that look bad need . . . to be concerned."

After the meeting, Gomez confronted Auzenne about the continued use of non-risk-adjusted data. Gomez testified:

> [Auzenne] said that he had spoke[n] to CEO Keith Alexander and they had discussed it and they felt that the data needed to be shared, that we needed to be a transparent organization, that this was a safety issue, . . . and that means they can do what they will with the data and that he was going to show it and had shown it to cardiologists at cardiology meetings and other physicians who referred to me so they can make informed decisions when they refer patients.

According to Gomez, "several doctors" confirmed that the hospital had been sharing his individual mortality data. Auzenne denied making the statement and sharing data on an individual surgeon with anyone other than that individual. None of the doctors referring patients to Gomez testified at trial.

Gomez had been experiencing a decline in cardiovascular surgeries and believed that a "whisper campaign" by Memorial City and its sharing of the misleading data injured his reputation and explained the decline in his practice. After a confrontation with CEO Alexander, Gomez resigned his privileges at Memorial City in April 2012 and moved what remained of his "damaged" practice entirely to Methodist West.

**B**

Gomez and his professional association[2] sued Memorial Hermann for an illegal restraint of trade (antitrust conspiracy), tortious interference with prospective business relations, defamation, and business disparagement. After extensive discovery,[3] the case was tried to a jury for three weeks.

The parties worked extensively with the trial court to craft the jury charge. Trial centered on the anticompetition claims, which were the first claims presented to the jury. The final charge for the antitrust conspiracy and tortious interference claims asked broadly if "Memorial Hermann conspire[d] with others to restrain trade by causing referring physicians to stop referring . . . surgical patients to Dr. Gomez" and whether that conspiracy actually restrained trade or interfered with his business relationships. Gomez sought a similarly broad question for the defamation and business disparagement claims, proposing the following: "Did Memorial Hermann publish inaccurate data related to the mortality rates of Dr. Gomez's patients?" Memorial Hermann objected that the question was too vague, and the trial court agreed.[4]

---

[2] Miguel A. Gomez, M.D., P.A.

[3] Along the way we resolved a discovery dispute largely in Gomez's favor. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686 (Tex. 2015).

[4] In a defamation case we decided a few Terms ago, the trial court had submitted a broad jury charge that did not identify specific statements but instead asked: "Did any of the [defendants] publish a statement that [plaintiff] was involved in taking kickbacks?" *See Durant v. Anderson*, No. 02-14-00283-CV, 2020 WL 1295058, at *16 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied). The defendants challenged the charge on the ground that it failed to require the jury to find that they made specific defamatory

7

The court asked Gomez for a "laundry list" of the specific statements on which he was relying. Ultimately, the parties agreed to inquire of the jury about two specific statements quoted in the charge. Neither side objected.

One statement was by Todd, who told Peña concerning Gomez: "I heard bad quality, high mortality rates, unnecessary surgeries." The other was Auzenne's statement to Gomez that:

> he had spoke[n] to CEO Keith Alexander and they had discussed it and they felt that the data needed to be shared, that we needed to be a transparent organization, that this was a safety issue, . . . and that means they can do what they will with the data and that he was going to show it and had shown it to cardiologists at cardiology meetings and other physicians and who referred to me so they can . . . make informed decisions when they refer patients.

With respect to each quoted statement, the charge instructed the jury to "[a]nswer the following questions with respect to [Todd's or Auzenne's] alleged statement that . . ."—then set out in quotation marks the statements just quoted. The charge then asked, on Gomez's defamation claim:

1. Did Memorial Hermann publish the statement?
2. Was the statement false at the time it was made as it related to Dr. Gomez?
3. Was the statement defamatory concerning Dr. Gomez?
4. Did Memorial Hermann know or should it have known in the exercise of ordinary care that the statement was false and had the potential to be defamatory?
5. Should Dr. Gomez, in the exercise of reasonable diligence,

---

statements. We did not reach the argument because of our disposition of other issues. *Anderson v. Durant*, 550 S.W.3d 605, 623 n.95 (Tex. 2018).

8

have discovered the statement before September 17, 2011? Each of the questions referred to "the statement".

The jury was also asked for each of the two statements whether they disparaged Gomez's professional association. As on the defamation claim, the jury was instructed to "[a]nswer the following questions with respect to" each statement set out in quotation marks. The jury was instructed that "Memorial Hermann disparage[d] Gomez PA if it publishe[d] a disparaging false statement about the business". The jury was further instructed that "[a] statement is 'published' if it is intentionally communicated to a person other than Dr. Gomez who is capable of understanding its meaning."[5]

The questions about the Auzenne statement confused the jury. In a note to the court during its deliberations, the jury asked: "[D]oes the court want to know if the <u>exact</u> statement [by Auzenne] as quoted was published or if the data referred to in the statement is being published?" The trial court recognized that instructing the jury to consider whether the data were published rather than the quoted statement would revert to the question Gomez had proposed originally and the court had rejected. But the trial court also acknowledged that instructing the jury to consider only the quoted statement itself was tantamount to directing

---

[5] *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT PJC 110.1 (2020) (explaining that the defamation and business disparagement questions "assume as their subject a single allegedly defamatory statement"); PJC 110.2 (proposing that the jury be asked: "Did [defendant] publish the following: [insert alleged defamatory matter]?"); PJC 110.15 (providing model business disparagement question, asking the jury to consider "only" the submitted statements, which must be "defined by pleadings and proof").

9

a verdict for Memorial Hermann because there was no evidence that Auzenne made the statement to anyone but Gomez and therefore did not publish it. Although the court believed "the intent of the question is to inquire about the data", it declined to alter the question Gomez had agreed to submit. Faced with this conflict, the trial court instructed the jury simply "to answer [the questions] to the best of the jury's ability as the jury understands the questions."

The jury found no illegal antitrust conspiracy or tortious interference with business relations on the part of Memorial Hermann. But the jury did find for Gomez on the defamation and business disparagement claims, answering all questions regarding the Todd and Auzenne statements in his favor. The jury awarded damages for loss of reputation, mental anguish, lost profits, and exemplary damages. In total, the trial court's final judgment awarded Gomez over $6.3 million.

The court of appeals affirmed.[6] It rejected Memorial Hermann's argument that the question to the jury was whether Auzenne's statement itself was published as quoted in the charge, holding instead that the question inquired whether the data referred to in the statement

---

[6] 584 S.W.3d 590 (Tex. App.—Houston [1st Dist.] 2019). Gomez filed a conditional cross-appeal in the court of appeals, requesting a new trial on the tortious-interference-with-prospective-business-relations claim if the trial court's judgment were reversed. Because the court of appeals affirmed the judgment, it did not address Gomez's cross-appeal. *Id.* at 622 n.9. For the reasons discussed below, *infra* note 33, Gomez's cross-appeal lacks merit, and a remand to the court of appeals on this issue is therefore unnecessary. *See RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 124 (Tex. 2018) ("When presented with an issue the court of appeals could have but did not decide, we may . . . consider the issue ourselves." (citing TEX. R. APP. P. 53.4)).

were published.[7] Similarly, the court rejected Memorial Hermann's argument that the jury was asked whether Todd's exact statement to Peña caused harm, holding instead that the question inquired whether a "whisper campaign" of "circulating rumors" about Gomez, of which Todd's statement was typical, caused harm.[8] Based on this interpretation of the jury charge, the court of appeals determined that the record contained evidence that the data Auzenne referred to in his statement to Gomez were published,[9] and that the Todd statement caused harm to Gomez's reputation and lost profits to his professional association.[10]

We granted Memorial Hermann's petition for review.

## II

Recovery for defamation requires proof (1) of the publication of a false statement of fact to a third party, (2) that defamed the plaintiff, (3) with the requisite degree of fault, and (4) that proximately caused damages.[11] "A business disparagement claim is similar in many respects to a defamation action."[12] Among other elements, a successful claim of business disparagement requires proof of both a published false

---

[7] 584 S.W.3d at 612.

[8] *Id.* at 614-615.

[9] *Id.* at 612-613.

[10] *Id.* at 615.

[11] *Anderson v. Durant*, 550 S.W.3d 605, 617-618 (Tex. 2018).

[12] *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

11

statement and that the statement caused damages to the plaintiff.[13] Memorial Hermann argues that no evidence supports the jury's findings that Memorial Hermann published the Auzenne statement or that the Todd statement caused Gomez or his professional association any damages. Both arguments require us to interpret the charge before considering the evidence.

**A**

As we have explained, for both the defamation and business disparagement claims, the charge instructed the jury to:

> Answer the following questions with respect to Byron Auzenne's alleged statement that "he had spoke[n] to CEO Keith Alexander and they had discussed it and they felt that the data needed to be shared, that we needed to be a transparent organization, that this was a safety issue, . . . and that means they can do what they will with the data and that he was going to show it and had shown it to cardiologists at cardiology meetings and other physicians and who referred to me so they can . . . make informed decisions when they refer patients."

The charge then asked the jury: "Did Memorial Hermann publish the statement?"[14]

In determining whether a charge interpretation is reasonable,

---

[13] "To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Id.* (citing *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987)).

[14] The business disparagement question asked: "Did Memorial Hermann disparage Gomez PA?" It then instructed the jury that a statement must be published in order to support a claim of business disparagement. Again, the jury charge instructed the jury to answer this question "with respect to Byron Auzenne's alleged statement".

12

"[t]he charge must be viewed as a whole, and interpreted in the light of its entire content, of the issues between the parties, and of the evidence relevant thereto."[15] Jury charges are given their commonsense interpretation, gleaned from both the text of the charge and the context of the case.[16] When faced with ambiguous jury findings, a reviewing court must interpret the charge such that the findings uphold the judgment.[17] But a court cannot ignore a charge's plain, commonsense meaning merely because an unreasonable interpretation would better align with the judgment.[18]

Our decision in *Jackson v. U.S. Fidelity & Guaranty Co.* provides

---

[15] *Broughton v. Humble Oil & Refin. Co.*, 105 S.W.2d 480, 485 (Tex. Civ. App.—El Paso 1937, writ ref'd).

[16] *Id.*; *see also L & S Meats, LLC v. USA Feedyard, LP*, No. 07-18-00030-CV, 2020 WL 371726, at *3 (Tex. App.—Amarillo Jan. 22, 2020, pet. denied) ("The relevant viewpoint [in interpreting a jury charge] is that of a juror untrained in the law who is exercising common sense. . . . To that we add the duty to interpret them . . . in the context of the whole situation before the jury." (citations omitted)); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 772 n.3 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("We are to read jury instructions like jurors do—with common sense." (collecting cases)).

[17] *Jackson v. U.S. Fid. & Guar. Co.*, 689 S.W.2d 408, 412 (Tex. 1985) (citing *First Fed. Sav. & Loan Ass'n of Dallas v. Sharp*, 359 S.W.2d 902, 903 (Tex. 1962)).

[18] *See Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 613 (Tex. 1996) (despite evidence that plaintiff would incur future medical costs as a result of a head injury, holding that no evidence supported the jury's finding that plaintiff would incur future medical costs as a result of the defendant's wrongfully inducing her to settle a claim); *Tex. Dep't of Transp. v. Guerra*, 858 S.W.2d 44, 46-47 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (holding that when a jury charge asked whether the state gave "a warning", the charge could not be reinterpreted to ask whether the state gave "an adequate warning", even though doing so would align with the judgment).

a template for jury charge interpretation.[19] The jury there was tasked with allocating by percentage the cause of incapacity in the plaintiff's hand between two preexisting injuries and the injury in question.[20] The jury found that the plaintiff's two preexisting injuries contributed 2.5% and 10%, respectively, to his 25% loss of use. One interpretation of the findings was that 12.5% (10% plus 2.5%) *out of* the 25% incapacity—half (25% minus 12.5%)—was caused by the preexisting injuries. Another interpretation was that only 12.5% *of* the 25% incapacity—3.125% (12.5% times 25%)—was attributable to the preexisting injuries. We concluded that both interpretations were reasonable and that the verdict was ambiguous. The trial court rendered judgment based on the first interpretation. Because, and only because, we were presented with two reasonable interpretations of the jury charge, we interpreted the ambiguous findings so as to uphold the judgment.[21] We did not simply work backwards from the judgment to arrive at an accommodating interpretation. The interpretation must first be reasonable.

Memorial Hermann argues that the jury was asked questions about Auzenne's statement to Gomez, not the data Auzenne referred to in his statement. The text of the jury instruction was unmistakably clear. It directed the jury to "[a]nswer the following questions with respect to Byron Auzenne's alleged statement that . . ."—then set out in

---

[19] 689 S.W.2d 408 (Tex. 1985).

[20] *Id.* at 409-410.

[21] *Id.* at 412 ("Having held that the issues were susceptible to the interpretations of both Jackson and the courts below, the law is clear that we must affirm the judgments below in this case.").

quotation marks Auzenne's statement to Gomez, taken verbatim from Gomez's testimony about what Auzenne said to him. The use of quotation marks gave the jury the "exact phraseology" they were to consider.[22] The first question was: "Did Memorial Hermann publish the statement?"[23] That is, did it make the statement to someone other than Gomez? Each of the other questions also referred to "the statement". Memorial Hermann's interpretation of the charge is certainly reasonable. From the text itself, it is inescapable.

The context of the case also supports interpreting the charge as asking only about the specific quotation provided to the jury. The jury was presented with two general theories of liability: (1) antitrust conspiracy and tortious interference with prospective business relations (the anticompetition claims), and (2) defamation and business disparagement (the defamation claims). The anticompetition claims were based on the amorphous "whisper campaign," not on specific statements. The jury charge asked broadly whether Memorial Hermann "conspire[d] with others to restrain trade" to Gomez's detriment. While Gomez had to prove "that the alleged conspiracy existed", the jury was not asked whether any specific action or statement constituted an

---

[22] *See Quotation Mark*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020).

[23] Again, the business disparagement question used different phrasing, but the effect was the same. It provided the quoted statement, instructed the jury to answer "with respect to" the quoted statement, asked if "Memorial Hermann disparage[d] Gomez PA", and explained that "Memorial Hermann disparage[d] Gomez PA if it publishe[d] a disparaging false statement about the business, and, when it publishe[d] the statement, it kn[ew] the falsity of the statement or act[ed] with reckless disregard of whether the statement [was] false".

antitrust violation. In contrast, on the defamation and disparagement claims, the charge asked the jury to "answer the following questions with respect to [a specific] alleged statement" that was quoted verbatim from the testimony. Those questions repeatedly referred to "the statement", as distinct from a broad conspiracy or general restraint of trade.

While we must interpret the charge from the jury's perspective, we think a reasonable juror should have read the instruction and questions regarding the Auzenne statement according to their plain, simple words. And the jury should have read the charge as referring to a specific quoted statement, just as the following questions about the Todd statement did, which we will address momentarily.

Gomez argues that the charge asked not about Auzenne's specific statement but about the individual surgeon mortality data the statement referred to. But the language simply cannot be read in a commonsense manner to refer to Auzenne's general use of the data. Courts have long disclaimed requiring "perfection of expression as to each isolated sentence" of a jury charge.[24] But we do look to the ordinary understanding of the words.[25] In this case, the charge instructed the jury to answer the questions "with respect to" a single quoted statement.

_____

[24] *Broughton v. Humble Oil & Refin. Co.*, 105 S.W.2d 480, 485 (Tex. Civ. App.—El Paso 1937, writ ref'd).

[25] *See id.* at 486 ("[T]he words employed in instructions and issues must be taken in the ordinary and popular acceptation. The language will be given the plain, commonsense meaning it was evidently intended to convey when considered in the light of the charge as a whole . . . ." (quoting *West v. Cashin*, 83 S.W.2d 1001, 1006 (Tex. Civ. App.—Galveston 1935, writ dism'd))).

The questions, in turn, asked about "the statement". The ordinary meaning of "statement" compels the conclusion that the questions referred to what the charge directly provided, not a vague showing of data to unspecified others. Put in its simplest terms, "the statement" is the statement that was provided for the jury.

The court of appeals disagreed, determining that the statement identified by the charge was "the individual surgeon mortality data" in general.[26] In conducting what it considered to be a "common-sense" reading of the charge,[27] the court of appeals placed significant emphasis on the evidence presented in the case.[28] Since the "crux" of the case was Auzenne's use of the individual surgeon mortality data, that must be what the jury charge asked about.[29] Because the evidence and the pleadings revolved around Memorial Hermann's general dissemination of Gomez's individual surgeon mortality data, the court of appeals determined that it would be nonsensical to interpret the jury charge as asking only about what Auzenne said to Gomez.[30]

We agree that the evidence and pleadings can assist a court in interpreting a jury charge,[31] especially the evidence because it provides the context for the jury's understanding of the case. But the evidence and the pleadings are not determinative. A court is not free to rewrite

---

[26] 584 S.W.3d 590, 612 (Tex. App.—Houston [1st Dist.] 2019).

[27] *See id.*

[28] *See id.* at 610-612.

[29] *Id.* at 612.

[30] *Id.* at 612-613.

[31] *See State v. Hale*, 146 S.W.2d 731, 739-740 (Tex. 1941).

17

an unobjected and unambiguous jury charge in order to better capture what it perceives to be the "crux" of the case.[32] The jury may have thought it would be asked about the publication of the data rather than Auzenne's statement to Gomez, as indicated in its request to the trial court for clarification. The jury was not present when that issue was decided by the trial court and counsel. But it was not free to disregard what the charge plainly asked. To hold otherwise would be to allow the jury to not just make the findings, but determine which findings are to be made. That is the province of the court.

In this case, the plain language of the instruction simply does not accommodate Gomez's interpretation, which seeks to revert the charge to the questions that the trial court rejected and the parties replaced by agreement. Alignment with the evidence and pleadings alone does not make this interpretation reasonable. Gomez's proffered interpretation of the jury charge is not reasonable. Accordingly, it cannot be used to support the judgment.

The charge directed the jury to consider Auzenne's statement to Gomez, not Auzenne's use of the individual surgeon mortality data.

---

[32] *See Seger v. Yorkshire Ins. Co., Ltd.*, 503 S.W.3d 388, 407 (Tex. 2016) ("Even if another legal theory was argued to the jury and explained by the lawyers in argument, we are bound by the instructions given to the jury . . . ." (citing *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 861-862 (Tex. 2009))); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge . . . that measures the sufficiency of the evidence when the opposing party fails to object to the charge." (collecting authorities)). The court of appeals correctly noted that "[t]he trial court has broad discretion in submitting jury questions". 584 S.W.3d at 612 (quoting *City of Brenham v. Honerkamp*, 950 S.W.2d 760, 764 (Tex. App.—Austin 1997, pet. denied)). But Gomez did not object to the jury charge, so we do not consider whether the trial court abused its discretion in submitting this jury charge.

There is no evidence that Auzenne's statement to Gomez was published. Gomez does not dispute this. The trial court erred in awarding Gomez damages for defamation and business disparagement arising out of the Auzenne statement.[33]

**B**

The jury was also asked whether a second statement, made by Todd to Peña, defamed Gomez or disparaged his professional association. Like the Auzenne statement, the Todd statement was quoted in the charge. The jury was instructed to "[a]nswer the following questions with respect to Jennifer Todd's alleged statement that 'I heard bad quality, high mortality rates, unnecessary surgeries.'" The jury found that publication of the statement proximately caused damages of $1,004,500 to Gomez for lost reputation and the same amount to his professional association for lost profits. Memorial Hermann argues that there is no evidence of causation of the damages found.

"Proximate cause encompasses both foreseeability and cause in fact."[34] The general test for cause in fact is whether the defendant's act was "a substantial factor in causing the injury and without which the

---

[33] For the same reason, a claim for tortious interference with prospective business relations predicated on Auzenne's statement to Gomez must fail as well. "[T]o recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful." *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001). Auzenne's statement to Gomez, which was not published, was not independently tortious under *Sturges*. Accordingly, the trial court did not err by refusing Gomez's request to include tortious interference questions predicated on Auzenne's nonactionable conduct.

[34] *Anderson v. Durant*, 550 S.W.3d 605, 618 (Tex. 2018) (citing *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010)).

injury would not have occurred."[35] Because of the jury charge, our review is limited to the damage proximately caused by Todd's specific statement.

General damages are awarded for noneconomic harms, such as mental anguish or loss of reputation.[36] General damages are not susceptible to precise calculation.[37] Because of the inherent difficulty in precisely quantifying noneconomic damages, Texas law grants the jury a degree of latitude in this determination.[38] But the awarded damages must flow from actual injuries.[39] Thus, in most cases,[40] there must be proof of actual injury before a jury can award general damages.

A defamation damage award compensates for the "*actual* impact

---

[35] *Id.* (quoting *Bos v. Smith*, 556 S.W.3d 293, 307 (Tex. 2018)).

[36] *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 418 (Tex. 2020); *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014).

[37] *Anderson*, 550 S.W.3d at 618, 621.

[38] *Id.* at 618; *Burbage v. Burbage*, 447 S.W.3d 249, 259-260 (Tex. 2014).

[39] *Burbage*, 447 S.W.3d at 260 ("Although we agree that the jury generally has broad latitude in determining damages, we find no evidence of actual injury in the record.").

[40] In some cases, the statement is so obviously harmful to one's reputation that the jury may presume the existence of nominal general damages, without proof of actual injury. *Innovative Block of S. Tex., Ltd.*, 603 S.W.3d at 418; *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002). We call such statements defamatory *per se*. But any award beyond a "nominal" or "trifling" sum must be supported by the evidence. *In re Lipsky*, 460 S.W.3d 579, 593-594 (Tex. 2015); *Hancock v. Variyam*, 400 S.W.3d 59, 65-66 (Tex. 2013). Neither party contends that Todd's statement was defamatory *per se*, and $2 million is well beyond a "trifling sum". *See id.* at 65 ("We have defined nominal damages as a 'trifling sum,' such as $1." (citing *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 665 (Tex. 2009))).

of the defamation".[41] Such impact must be more than theoretical.[42] The evidence must show "that people believed the statements and the plaintiff's reputation was actually affected."[43]

Direct evidence that people changed their opinion of the plaintiff as a result of the defamatory statement can meet this threshold.[44] In *Brady v. Klentzman*, there was evidence that the plaintiff had a good reputation before the publication, but that "people in the community . . . had a negative impression" of the plaintiff after the defamatory publication.[45] This direct evidence that people within the community "thought less of" the plaintiff after the publication constituted legally sufficient evidence that the publication harmed the plaintiff's reputation.[46]

Similarly, evidence of a lost job or business opportunity due to the defamation can be sufficient. In *Brady*, we determined the evidence was legally sufficient when the plaintiff lost his job in such a way that a reasonable juror could conclude it was related to the defamatory statements.[47] In *Anderson v. Durant*, the plaintiff's prospective employer had a high opinion of the plaintiff and thought he was "a good

---

[41] *Burbage*, 447 S.W.3d at 262.

[42] *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017).

[43] *Anderson*, 550 S.W.3d at 621 (quoting *Brady*, 515 S.W.3d at 887).

[44] *See id.*

[45] 515 S.W.3d at 887.

[46] *Id.* at 887-888.

[47] *Id.*

guy".[48] But the employer cut off the hiring process with the plaintiff because of the defamatory rumors and would not consider the plaintiff for another position unless the plaintiff's name were cleared.[49] This evidence was legally sufficient to support reputational damages, as it showed a loss caused by the defamatory statements.[50]

In this case, there is no evidence, viewed in the light most favorable to the verdict, that Todd's statement to Peña caused an injury to Gomez's reputation. While Peña testified that she "absolutely did believe" Todd's statements regarding Gomez, this was only because the information shared by Todd was already—as she put it—"kind of everywhere". Any change in Peña's opinion of Gomez was not caused by Todd's statement. Peña had "witnessed it" and "heard it from multiple physicians" before hearing it from Todd.

Methodist West was in the process of hiring Gomez when Peña received Todd's phone call. According to Peña, putting the Methodist West name behind a physician is "a big deal". Part of her job was to ensure that Methodist West's hiring team was doing its "due diligence to try to bring [high] caliber and quality of physician to [Methodist West's] campus." This included evaluating physician skill and reputation. In making a hiring decision, Peña explained, the physician's "reputation ranks about as high as what their skill level is". As part of her "due diligence", Peña shared the concerns that she had been hearing with Voss—Methodist West's CEO.

---

[48] 550 S.W.3d at 622.

[49] *Id.* at 622-623.

[50] *Id.*

After a full evaluation, Methodist West hired Gomez and gave him an administrative leadership position. Nothing in the record indicates that Todd's statement reached anyone besides Peña and Voss, and Peña explicitly denied sharing physician data or similar information with other physicians. Methodist West's Chief of Staff testified that Gomez had always enjoyed a good reputation at Methodist West. Peña testified that she thinks highly of Gomez.

In sum, Todd told Peña something that Peña had already heard. Todd's statement did not cause Peña to change her opinion of Gomez—the information was "was kind of everywhere" already. Peña testified that she reported it to Voss out of caution and as part of her job, not because she thought less of Gomez. And most importantly, Methodist West (through Voss and Peña) hired Gomez—something that the hospital does not do unless the physician's skill and reputation prove exemplary.

In affirming the award, the court of appeals interpreted the charge to inquire not just about Todd's quoted statement but about "circulating rumors that Gomez was a 'bad quality' surgeon".[51] The court relied on testimony that "the 'whisper campaign' was real and that it impacted Gomez's reputation and business."[52] But this testimony is outside of our review. We must measure the sufficiency of the evidence against the jury charge, which asked about damages caused by Todd's statement to Peña, not damages caused by a widespread "whisper

---

[51] 584 S.W.3d 590, 615 (Tex. App.—Houston [1st Dist.] 2019).

[52] *Id.* at 614.

campaign". Evidence of reputational harm caused by the alleged "whisper campaign" does not amount to any evidence of harm caused by Todd's specific statement.

The court of appeals also pointed to Gomez's decreased cardiovascular surgery count at Methodist West as evidence of reputational harm.[53] As we have noted, "[l]osing a job or business opportunity due to defamation can support recovery of reputation damages."[54] But that loss must be connected to the defamatory statements before the jury.[55] Nothing in the record connects Peña to any of Gomez's referring physicians. The evidence is legally insufficient to establish that Todd's statement caused Gomez any loss of referrals or business.

The evidence does not show that Todd's statement caused any actual loss of reputation to Gomez. Accordingly, we hold that no evidence supports the jury's award of $1,004,500 in damages for loss of reputation.

Nor is the evidence legally sufficient to support the $1,004,500 lost profit award, for similar reasons. As discussed above, there is no evidence that Todd's statement to Peña caused any damage to Gomez or his practice. Methodist West hired Gomez. Gomez points to his loss in referrals. But again, no evidence connects Peña to any of his referring

---

[53] *Id.* at 615.

[54] *Anderson*, 550 S.W.3d at 622.

[55] *Id.* at 621 ("Evidence that the plaintiff has lost a job or business opportunities may be evidence of loss of reputation, but only if it is connected to the defamatory statements.").

physicians. In affirming the award, the court of appeals again improperly relied on evidence of the harm caused by "circulating rumors", not the harm caused by Todd's specific statement.[56] Narrowing the jury charge to its proper scope, we hold that there is no evidence that Todd's statement to Peña caused Gomez to lose any profits. Because Todd's statement did not cause Gomez any injury, we reverse the jury's award for lost profits.

\*     \*     \*     \*     \*

By rejecting the broadly framed antitrust claims, the jury drastically limited the scope of this long-running dispute to two quoted statements. One statement was not published. The other did not cause any damages. The jury charge asked about these statements—not an amorphous "whisper campaign" that the statements supposedly "represented". Accordingly, we reverse the judgment of the court of appeals and render a take-nothing judgment for Memorial Hermann.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** April 22, 2022

---

[56] 584 S.W.3d at 615.