**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00158-CV**
_____

**JEPSON-BLUHM, LLC D/B/A INTERNATIONAL PRECIOUS METALS AND NATHAN CURRIE, Appellants**

**V.**

**MONTGOMERY CHANDLER, INC. AND MICHAEL BROWN, Appellees**

**On Appeal from the 58th District Court**
**Jefferson County, Texas**
**Trial Cause No. A-196,113**

**MEMORANDUM OPINION**

This is an appeal from a final judgment entered after a jury trial in a defamation case. Montgomery Chandler, Inc. sued Jepson-Bluhm, LLC d/b/a International Precious Metals ("IPM") and its employee, Nathan Currie, for statements Currie made in an online post regarding the criminal history of one of

1

Montgomery Chandler's employees, Michael Brown.[1] The jury found Currie made false and defamatory statements about Montgomery Chandler while acting in the scope of his employment with IPM. The jury awarded $81,000 in damages for Montgomery Chandler's loss of reputation in the past and $320,000 in exemplary damages. The trial court reduced exemplary damages to the statutory cap but otherwise entered judgment on the verdict.

Appellants raise six issues on appeal. In their first four issues, Appellants challenge the legal and factual insufficiency of the evidence supporting the jury's liability and actual damages findings and argue exemplary damages cannot be awarded in the absence of actual damages. In their fifth issue, Appellants assert the trial court erred in overruling IPM's hearsay objections to three emails that were admitted into evidence. And in their last issue, Appellants complain that the trial court included a spoliation instruction in the jury charge. As explained below, we overrule each of these issues and affirm the trial court's judgment.

---

[1]We refer to IPM and Currie collectively as "Appellants."

## Background

IPM and Montgomery Chandler are competitors in the coin and bullion business in Silsbee, Texas. The company doing business as IPM was initially owned by non-party Carl Wright, the ex-husband of Paula Cook, who now owns Montgomery Chandler.

Michael Brown was married to Wright's sister and went to work for Wright as a sales representative at IPM in 1996. At IPM, Brown was a successful salesman and worked his way up in the company, holding the positions of salesperson, sales manager, national sales director, and account representative. Barry Jepson went to work as a salesperson for Wright at IPM and worked alongside Brown for years.

Wright and Cook separated in 2006 and Cook formed Montgomery Chandler in 2010. When Cook left IPM, she still possessed a copy of its customer list which had around thirty to forty thousand names on it. After Wright and Cook divorced in 2012, Wright retained sole ownership of IPM, including the exclusive right to IPM's client list. Nevertheless, Cook began using the list at Montgomery Chandler.

In 2013, Wright sold IPM's assets, including IPM's exclusive client list, to Jepson and Jepson's sister, who formed Jepson-Bluhm, LLC, and continued to operate as IPM. IPM hired Nathan Currie as its Chief Operating Officer and Chief Information Officer in 2013, and he remained in those positions through the time of

3

trial. IPM fired Brown in 2014 after learning that Brown, a convicted felon, went hunting with sales staff and clients, used guns for target practice, and sold a pistol in IPM's office. After being terminated from IPM, Brown went to work for Montgomery Chandler.

IPM sued Brown and Montgomery Chandler in September 2014, seeking injunctive relief and claiming Brown was violating a covenant not to compete and IPM's trade secrets by working at Montgomery Chandler and using IPM's customer list. In March 2018, after years of litigation, Montgomery Chandler filed a counterclaim asserting a defamation action against Currie and IPM. Montgomery Chandler alleged that in February 2018, its clients received email blasts from the email address coincrimedotorg@gmail that included a link to a website, Coincrime.org. The email and website contained a November 15, 2017, article Montgomery Chandler contends was false, defamatory and damaging to its reputation. Under the headline "East Texas Coin Dealer Managed By Convicted Murderer" the article states:

> Silsbee, TX – An eastern Texas coin dealer is under fire after it was revealed that the sales director was convicted of felony murder, raising ethics questions and preventing the company from operating in certain states. According to the Kerrville Mountain Sun, Michael Angelo Brown III, listed as the sales director by Montgomery Chandler (www.montgomerychandler.com) in Silsbee, Texas, was convicted of felony murder in Kerrville, TX as part of a drug deal gone bad.

4

Brown was indicted and established a plea deal for the murder of Joe Henry Chacon, who was shot in the back with a large caliber handgun. In an archived article from the newspaper, the account reads:

"Michael Angelo Brown, 18, turned himself in to authorities Thursday and was booked into Kerr County Jail on murder charges. Brown was indicted on March 20 for the murder of Joe Henry Chacon, who was shot in the back with a large caliber handgun at the Oakdale Apartments last December. Kerrville Police Detective Chuck Dickerson said Brown had been out of state since December. It is believed the shooting was drug-related."

After the incident Brown established a plea deal and was convicted of murder.

The article concludes with a stock photo showing a man from the chin down, dressed in a suit and wearing handcuffs.

In March 2018, Montgomery Chandler's counsel sent Appellants' counsel a letter requesting the preservation of electronic information related to the claim, and in September, Montgomery Chandler's counsel requested that Currie's laptop be produced for inspection. The laptop was produced in November, but in the two months leading up to its production, one of its hard drives was unreadable, and fifty percent of the data on the other hard drive was overwritten. Montgomery Chandler filed a motion for sanctions, and after a hearing, the trial court found that the laptop had been intentionally altered and ordered that the jury would receive a spoliation instruction.

5

After the trial court denied competing motions for summary judgment, the defamation case was tried to a jury. Five witnesses testified: Paula Cook, Paul Brown, Michael Brown, Barry Jepson, and Nathan Currie.

*Testimony of Paula Cook*

Cook has known Michael Brown for twenty-nine years and worked with Brown at IPM. At IPM, Brown held the positions of salesperson, sales manager, national sales director, and account representative. Cook hired Brown after he was fired by IPM, but IPM obtained a restraining order so that Brown was unable to work for Montgomery Chandler for three months.

In February 2018, Montgomery Chandler clients began calling and emailing Cook with an attachment of the article from the Coincrime.org website. Some of the client emails – which were admitted over IPM's hearsay objection – were forwarded to Brown asking him about the article. At the time, Cook did not know how many clients received the article but later discovered 1,383 email addresses received it after she received a report from Google with a list of the recipients' email addresses. Of the 1,383 email recipients, 881 email addresses, or sixty-four percent, are on Cook's client list. However, Cook does not know how many recipients actually opened the email.

Cook testified she believes the Coincrime.org article is false and defamatory in several ways. First, Cook testified that the headline "East Texas Coin Dealer Managed by Convicted Murderer" is false because Brown has never been a manager at Montgomery Chandler. Instead, Brown's positions at Montgomery Chandler have included precious metals expert, salesperson, and account representative. At IPM, however, Brown was a sales manager. Cook explained that at Montgomery Chandler, Brown is paid like every other salesperson, which is a twenty-percent commission on sales. He has not received any type of other commission. In a 2021 deposition in another proceeding, Brown had testified that he was employed as a manager when he started working at Montgomery Chandler. Cook testified this statement was not accurate and she didn't know why he testified that way, although she did admit that Brown performs several managerial duties at Montgomery Chandler for which he is not compensated. Cook also disputed Brown's deposition testimony that he performs training at Montgomery Chandler.

Second, Cook testified the November 15, 2017, date on the article is not accurate and was "just a made up date" because the article is not true. Third, Cook testified Montgomery Chandler has never been "under fire" as the article states and was not under fire on November 15, 2017. She testified that the word "revealed" is also false because it "makes me think that it has – it's just now happened; and with

7

the date, November 15, 2017, nothing was revealed on that day or even around that day that I was under fire." Fourth, Cook asserted the term "sales director" used in the article is false as Brown has never been a sales director and has never been listed as a sales director on Montgomery Chandler's website.

Cook admitted that the third paragraph of the Coincrime.org article – which quotes an article published on March 28, 1986, in the Kerrville Mountain Sun newspaper – is true. Cook noted, however, that there was nothing in the Coincrime.org article to indicate the newspaper article was written in 1986 or that the murder had occurred thirty-five years ago. Likewise, Cook asserted the Coincrime.org article failed to inform the reader that the Kerrville Mountain Sun newspaper ceased publication in 2003. Lastly, Cook testified that the photograph in the Coincrime.org article was not Michael Brown.

Cook took issue with the words "managed," "sales director," "under fire," and "revealed" used in the article because "[a]ll that put together, I think, is more of what's wrong, not just each word….[i]t's misleading." Cook described the effect of the Coincrime.org article on Montgomery Chandler as "[c]haotic," "demoralizing," and "[u]npleasant." She said that it was "distracting" to have information out there that Brown is a convicted murderer. She hired a cyber security firm to determine

8

where the article came from. Based on that firm's report, she understood the post to originate at IPM and Nathan Currie.

Cook testified she believes the email blast caused her to lose sales and profits. According to Cook, many cancellations occurred during the period of January to June 2018, which Cook found significant because it coincided with the email blast whereas she normally receives very few cancellations. Cook was able to salvage some client relationships after explaining the situation to them. Cook attributed $74,500.12 in lost profits attributable to the email blast.

*Testimony of Paul Brown*

Paul Brown is the founder of Cyber Evidence, a firm that investigates digital evidence to determine whether computer crime has occurred. He conducted a forensic examination of Currie's laptop. Through his examination of Currie's laptop, he determined that the "coincrimedotorg" email address has a recovery email address linked to Nathan Currie, and that the recovery email address, itself, also has a recovery email address linked to Currie. He determined that these recovery email addresses used the IPM IP addresses to conduct activity and that Currie's IPM email address is the point of contact for the IPM IP address. He also found that when Currie's laptop was turned over for inspection, one of the hard drives was

9

unreadable, and fifty percent of the data on the other hard drive had recently been overwritten.

*Testimony of Michael Brown*

Michael Brown admitted that when he was eighteen years old, he was involved in a drug deal that went bad in Kerrville. He and his cousin tried to sell drugs to an individual who instead stole the drugs from them. Brown and his cousin then drove to Brown's sister's house and retrieved a pistol. They drove back to the apartment complex where the exchange took place and saw the individual that took the drugs. Brown's cousin handed him the gun and told him to shoot the individual. Brown pointed the gun out of the car window, pulled the trigger, threw the gun back at his cousin, and took off. After Brown's mother told him there was a warrant for his arrest, Brown returned to Kerrville and turned himself into the authorities. Brown pleaded guilty to murder. He was sentenced to ten years' probation and successfully completed probation in 1997 when he was working at IPM as a salesperson.

Brown admitted the statements in the article were true: he murdered Joe Chacon by shooting him in the back with a large caliber handgun. Brown admitted that he has possessed hunting rifles and shotguns probably a dozen times despite the prohibition against doing so as a convicted felon, and he had a hunting license to go

hunting with sales staff and clients on occasions. He also admitted he sold a pistol to an IPM employee "[s]o that it wouldn't be in my house."

Brown started working at IPM in 1996. As the company grew and hired additional salespeople, Brown's titles would change. Brown progressed from salesperson to sales manager and ultimately national sales director. Brown oversaw thirty salespeople as IPM's national sales director. Part of his job at IPM was to train employees. IPM fired Brown on July 28, 2014. Brown admitted that he was terminated from IPM because of his felony conviction. At the time he was terminated, he was aware that IPM was attempting to meet requirements to sell coins in Minnesota and that because of his felony conviction, he could not sell coins in Minnesota.

When Brown was hired by Cook at Montgomery Chandler in September 2014, he was hired as a salesperson. He denies ever being a manager or in a management position at Montgomery Chandler. He has always been paid as a salesman by receiving a percentage of his sales at Montgomery Chandler. When confronted with his deposition in a prior proceeding where he testified he was a manager for Montgomery Chandler, Brown said that he "misspoke" and that he has "never been a manager at Montgomery Chandler ever." He did admit, however, that he was "always training" in his position at Montgomery Chandler.

11

Brown first became aware of the Coincrime.org website in February 2018 when clients forwarded him the "coincrimedotorg" email they had received. The email's effect on the business operations of Montgomery Chandler was "chaotic." Everyone on the sales staff was talking about it. Brown was not able to function because it was a "devastating piece of information…bringing up my past."

Brown agreed with Cook's contention that there were false and defamatory statements in the Coincrime.org article. First, Brown testified that both the title and the date of the article were untrue because nothing happened at Montgomery Chandler on November 15, 2017. Brown testified that he and Montgomery Chandler were not "under fire[,]" nothing was "revealed[,]" he was not a "sales director[,]" and he was not convicted of murder on November 15, 2017. While agreeing that everything in the Kerrville Mountain Sun newspaper article is true, Brown took issue with the Coincrime.org article's failure to mention that the Kerrville Mountain Sun article was written thirty-five years ago or that the newspaper ceased to exist in 2003, fifteen years after the article was published. He also took exception with the fact the Coincrime.org article did not mention that he successfully completed probation. Brown also testified that the photograph in the Coincrime.org article was not him and that he was never photographed as the photo depicted.

*Testimony of Barry Jepson*

Barry Jepson testified Currie was the chief operating officer and chief information officer of IPM in January and February 2018, a position which Currie still currently holds. Currie's responsibilities include overseeing IPM's servers, phone system, and day-to-day IT operations. Jepson testified Currie did not email the Coincrime.org article under his direction, nor was he instructed to do it. Jepson denied any knowledge of Currie's sending the email blast from IPM computers. In fact, Jepson first learned about it when Montgomery Chandler's attorneys turned over the results of the examination of Currie's laptop to IPM's attorneys. Regarding Currie's work on the Coincrime.org website, Jepson testified that it was done on Currie's "own time" and that Jepson "can't really control what he's doing outside of the office." Jepson understood that the emails were sent to subscribers of Currie's blog, rather than to IPM's customers. Jepson denied sponsoring Currie's actions but conceded Currie still maintained his positions with IPM.

Jepson characterized Michael Brown as an "excellent salesman" when Brown worked at IPM. He explained the reasons for terminating Brown in July 2014. In the summer of 2014, a new law in Minnesota took effect which required each employee and the company to have a license to sell coins. IPM needed to conduct background checks on all of its employees, which would be sent to the state of Minnesota to

13

review. IPM repeatedly asked Brown to sign an authorization for the background check. Brown told Jepson there was something in his past that he didn't want anyone to know about. Jepson became concerned and conducted an internet background check on Brown. He discovered that Brown was convicted of first-degree murder.

Because Jepson had seen Brown possessing, and even selling, guns in IPM's office, he became "extremely concerned about our potential issues there with someone that's a convicted felon having weapons there." Jepson described the situation as "very difficult" because Brown had trained almost everyone at IPM, including Jepson. Jepson testified that the reason he fired Brown was

> because of personal[ly] seeing him with guns on…our property, knowing that he had sold guns to one of the employees, brought it up there to sell him a handgun, knowing that he hunts constantly. I've seen him with ARs. I saw him – the video of him shooting Tannerite. I remember that because I didn't know what Tannerite was. I had never seen that before.

> So, those were the real reasons is [sic], you know, I felt with him hunting on client's property, it was putting our clients in jeopardy, as well as putting myself and the company in danger.

*Testimony of Nathan Currie*

Nathan Currie is the chief operating officer and chief information officer at IPM. He disagrees with Montgomery Chandler's characterization that the IPM IP address was used to send out the "coincrimedotorg" email blasts. Currie testified that when he published the article, he did not have the intent to cause harm to

14

Montgomery Chandler. Currie established the Coincrime.org website on his own, with help from an Indian developer on a small technical matter. He wrote the article by himself on the Coincrime.org website using his laptop on November 15, 2017. He explained that he did not write the date in the article. Rather, the date was "stamped" when he created the blog entry; the November 15, 2017, date indicates the date of the blog. Likewise, he was not in Silsbee when he wrote the blog post; he was at home. He agreed IPM's office is located in Silsbee, and he acknowledged the location was not automatically stamped on the blog like the date was.

Currie agreed he testified in his deposition that he "made up the term 'is under fire[,]'" but explained that he used the "under fire" language in the article "because of the Minnesota factor and some other reasons." Currie agreed that he also made up the "after it was revealed" language in the article and that he made up the language characterizing Brown as a sales director at Montgomery Chandler. He acknowledged the photo used in the article was a stock photo and not a photo of Michael Brown. He chose the stock photo of a man in handcuffs because the article was about an arrest and conviction. According to Currie, there are two places in the article that make it evident that Brown's murder conviction was old news: it states Brown was 18 at the time of the murder, and it states he established a plea deal and was convicted.

Currie sent the Coincrime.org article to subscribers of his blog. He did not target any of Montgomery Chandler's customers. Currie explained that he is in charge of marketing at IPM and knows how both IPM and Montgomery Chandler acquire customers. Therefore, it is not difficult for him to get subscribers to his Coincrime.org blog because he uses the same marketing methods as anyone in the coin industry.

Currie started his Coincrime.org blog in early 2015 after helping a client whose coins were stolen. Currie helped find the coins and assisted law enforcement in arresting the criminals. In his blog, he shared news stories related to crime in the coin industry a few times a month. When Currie updated the blog, subscribers were notified by the blog through email that new content had been posted. In late 2017, Currie decided to make his blog available as a website. In a little over two years, Currie was able to obtain 1,383 subscribers to his blog. According to Currie, Jepson was not aware that Currie was writing his blog. Currie never told Jepson about the blog and his blog never came up in conversation. Currie's blog "was a hobby." He did not send individual emails to the subscribers of his blog but rather used a software tool to send emails from his blog as a campaign. The article was sent only to subscribers of his blog, and Currie obtained those email addresses when the subscribers signed up for his blog.

Currie testified he believes everything he wrote in the article is true or substantially true. Based on everything Currie knew, he believed Brown was a manager when he wrote the article.

*Verdict, Judgment and Post-trial Motions*

The jury found that Currie, while acting in the scope of employment for IPM, published false and defamatory statements about Montgomery Chandler, that he knew or should have known that the statements were false and defamatory, and that he knew or strongly suspected that the article presented a substantially false and defamatory impression. Although Montgomery Chandler sought lost profits, the jury did not award them, but the jury did find $81,000 as the amount that would compensate Montgomery Chandler for loss of reputation in the past. The jury also found malice attributable to IPM and assessed $320,000 in exemplary damages against IPM.

After the trial court entered a final judgment on the jury verdict, IPM and Currie filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, Motion for New Trial, and in the Further Alternative, Motion for Remittitur. IPM and Currie argued there was no evidence, or alternatively factually insufficient evidence, to support the jury's findings on both liability and damages, that the trial court's spoliation instruction was erroneous, and that the exemplary

damages award exceeded the statutory cap for noneconomic damages. The trial court granted the motion in part by applying the statutory cap for exemplary damages, but otherwise denied IPM and Currie's motions. After the trial court entered an Amended Final Judgment reflecting the capped exemplary damages, IPM and Currie appealed.

Analysis

Appellants' first issue challenges the legal and factual sufficiency of the evidence to support the jury's liability findings. The court's charge submitted two alternative theories of liability: in Questions 1 through 3, the jury was asked whether individual statements in the Coincrime.org article were false and defamatory, and in Question 4, the jury was asked whether the article as a whole created substantially false and defamatory impressions. Predicated on an affirmative answer to either theory of liability, the jury was asked questions about negligence, malice, and scope of employment. The jury answered each question affirmatively and awarded actual and exemplary damages which were also predicated on either theory. "When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988). "Therefore, we must consider whether the

18

evidence is legally insufficient to support liability under any theory submitted to the jury." *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 274 (Tex. 1995).

Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In evaluating whether the evidence is legally sufficient, "we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller,* 168 S.W.3d at 827); *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 114 (Tex. App.—Beaumont 2005, pet. denied). A defendant may prevail on a legal sufficiency challenge if the record of the trial shows either: (1) a complete absence of evidence of a vital fact; (2) some rule of law or the rules of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence admitted to the factfinder to prove a vital fact amounts to no more than a mere scintilla to support the verdict; or (4) the evidence conclusively establishes the opposite of the fact the factfinder found based on the evidence admitted at trial. *City of Keller*, 168 S.W.3d at 810 (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)).

19

In determining whether factually sufficient evidence supports a jury's verdict, we will "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In our review, we consider all the evidence admitted in the case, both the evidence that favors the verdict and the evidence that is contrary to the verdict. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

In order to establish a claim for defamation, a plaintiff must prove: "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se)." *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017).

Question 1 asked whether Currie published the following statements in the Coincrime.org article:

- "East Texas Coin Dealer Managed by Convicted Murderer."

- "An eastern Texas coin dealer is under fire after it was revealed that the sales director was convicted felony murderer"

- "According to the Kerrville Mountain Sun, Michael Angelo Brown III, listed as the sales director by Montgomery Chandler (montgomerychandler.com) in Silsbee, Texas was convicted of felony murder in Kerrville, TX as part of a drug deal gone bad."

20

Appellants do not dispute Currie published the statements in question, but in their first issue, Appellants challenge the legal and factual sufficiency of the evidence supporting the jury's affirmative findings that these statements were false and defamatory.

Question 2, which asked the jury whether any of the statements was defamatory, was accompanied by the following instructions:

> "Defamatory" means an ordinary person would interpret the statement in a way that tends to injure a Company's reputation and thereby expose the Company to financial injury or to impeach the Company's honesty, integrity, or reputation.

> In deciding whether a statement is defamatory, you must construe the statements as a whole and in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.

Question 3, which asked whether any of the statements was false, was accompanied by the following instruction:

> "False" means that a statement is neither true nor substantially true. A statement is "substantially true" if, in the mind of the average person, it is no more damaging to the person affected by it than a literally true statement would have been.

"Before turning to the evidence, we must delimit our review." *Burbage v. Burbage*, 447 S.W.3d 249, 260 (Tex. 2014). When a party does not object to the charge, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence[.]" *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Because Appellants did not object to Questions 2 and 3 or their accompanying

21

instructions, "[t]he jury charge sets the standard[,]" and we limit our analysis of Appellants' first issue to reviewing whether the evidence is legally and factually sufficient to support the jury's affirmative findings using the same standards the jury was given in the instructions.[2] *Burbage*, 447 S.W.3d at 260.

*Falsity*

Appellants argue, "The jury's findings regarding defamation are not supported by the evidence because the unpleasant statements relating to Brown are in fact true, and there was no false or substantially untrue statement that was defamatory as to [Montgomery Chandler's] reputation." We will first analyze whether the evidence is sufficient to support the jury's findings that at least one of the statements was untrue and substantially untrue before analyzing whether any such statement was defamatory.

*Statements Portraying Brown as Manager and Sales Director*

The text of the article expressly states an East Texas coin dealer (which the article identifies as Montgomery Chandler) was "under fire after it was revealed that the sales director was convicted of felony murder." The title of the article indicates

---

[2]We are not to be understood as implying any objection was warranted; rather, we assume without deciding that the questions were submitted to the jury in substantially correct wording and that the instructions accurately stated the law.

22

Montgomery Chandler was being "managed" by the convicted murderer. Michael Brown admitted he had been convicted of felony murder in 1986 and that the statements quoted from the Kerrville Mountain Sun's article were true. However, Brown and Cook both testified Brown was a salesperson, had never been a sales director or manager at Montgomery Chandler, and was never listed on its website as the sales director, despite the article's statement to the contrary.

Appellants argue the statements about Brown's position at Montgomery Chandler were either true or substantially true because Brown had some management responsibilities and had testified in another proceeding that he was a manager. This evidence, however, was not so overwhelming that it renders the jury's finding clearly wrong or unjust. Currie himself testified he "made up" the statements that Brown was a sales director and that Brown was listed as such on Montgomery Chandler's website. A reasonable jury could conclude from the entirety of the evidence that the article's statement that a convicted murderer was managing and directing Montgomery Chandler's coin dealership was not true and was more damaging to Montgomery Chandler's reputation than the literal truth, which was that Montgomery Chandler employed a salesperson who had been convicted of felony murder in 1986. We conclude the evidence is legally and factually sufficient to support a finding that the article's statements characterizing Brown's position at

23

Montgomery Chandler as a manager and sales director were neither true nor substantially true.

*Statement that Montgomery Chandler Was "Under Fire"*

Citing *Dickson v. Lilith Fund for Reprod. Equity*, 647 S.W.3d 410 (Tex. App.—Amarillo 2021), *aff'd*, 662 S.W.3d 355 (Tex. 2023), Appellants argue the phrase "under fire" was "rhetorical hyperbole that is not intended to be taken as literally true" because no one would believe that Montgomery Chandler was being "fired upon." Although "under fire" sometimes means "to be shot at[,]" in this context, it means "[s]ubject to intense criticism or judgment." *Under fire*, The Free Dictionary by Farlex, https://idioms.thefreedictionary.com/under+fire (last visited September 30, 2025). Appellants also argue "under fire" was merely figurative language used by Currie to express his opinion. However, "after the U.S. Supreme Court's landmark decision in *Milkovich v. Lorain Journal Co.*, the opinion inquiry seeks to ascertain whether a statement is 'verifiable,' not whether it manifests a personal view." *Dall. Morning News, Inc. v. Tatum,* 554 S.W.3d 614, 634 (Tex. 2018) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)). Whether Montgomery Chandler was being intensely criticized or judged when Currie published the article is a matter of verifiable fact rather than a matter of opinion. Cook and Brown testified Montgomery Chandler was never "under fire." Appellants

24

argue, "Brown did in fact come under fire, as he was terminated from IPM" when his murder conviction surfaced in 2014 while IPM was attempting to meet Minnesota licensing requirements. But the article does not say Brown or IPM was under fire; it says Montgomery Chandler was under fire. There is no evidence that Montgomery Chandler ever sought to do business in Minnesota nor that it was prevented from doing so due to Brown's conviction. When Currie was asked to indicate who was criticizing Montgomery Chandler at the time he wrote that Montgomery Chandler was "under fire," Currie testified, "I just made that up." We conclude the evidence is legally and factually sufficient to support a finding that the article's statement that Montgomery Chandler was "under fire" was neither true nor substantially true.

*Statement that Brown's Murder Conviction "Was Revealed"*

Cook testified she "disagree[d] with" and had a "big beef" with the word "revealed[.]" She considered the statement to be false because "[r]evealed makes me think that it has – it's just now happened; and with the date, November 15th, 2017, nothing was revealed on that day or even around that day that I was under fire." Brown testified the first sentence of the article was "wrong" because "[n]othing was revealed[.]" Brown agreed the sentence made it sound like it was "a current activity." Currie testified he made up the phrase "after it was revealed[.]" We conclude the

25

evidence is legally and factually sufficient to support a finding that the article's statement that Brown's murder conviction "was revealed" was neither true nor substantially true.

*Defamatory Meaning*

As the jury was instructed, Montgomery Chandler was required to prove that one or more of the statements listed in Question 1, construed as a whole and in light of the surrounding circumstances, would be interpreted by an ordinary person in a way that tends to injure Montgomery Chandler's reputation thereby exposing it to financial injury, or in a way that tends to impeach Montgomery Chandler's honesty, integrity or reputation. We review a jury's finding that a statement is defamatory under the traditional legal-sufficiency and factual-sufficiency standards set forth above. *See Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 117 (Tex. 2000) (applying "no evidence" standard). Whether a statement is capable of a defamatory meaning is a question of law only if reasonable minds cannot differ. *Id.* (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654-55 (Tex. 1987)).

Reasonable minds could conclude that the article's statement that Montgomery Chandler was "under fire" tended to injure the company's reputation or impeach the company's honesty, integrity or reputation. Although it is undisputed Brown had been convicted of murder, the article never mentions that the conviction

26

occurred in 1986, and other statements in the article which the jury found to be false indicate or imply that in November 2017 when the article was published, Montgomery Chandler was being subjected to intense criticism or judgment because the murder conviction had been "revealed." The statements portraying Brown as a manager or sales director do not, by themselves, tend to injure Montgomery Chandler's reputation, but reading them in context with the other statements, the jury was free to conclude those statements were more harmful to Montgomery Chandler's reputation than if the article correctly stated Brown was a salesperson. Additional language in the article, which is among the surrounding circumstances the jury was free to consider, indicates Brown's murder conviction was "raising ethical questions and preventing the company from operating in certain states." The jury may have concluded these additional statements increased the likelihood that an ordinary person reading the statements listed in Question 1 would believe that Montgomery Chandler was being subjected to intense scrutiny because its manager was a convicted murderer. We conclude the evidence is legally and factually sufficient to support a finding that the statements were defamatory concerning Montgomery Chandler, because reasonable minds could conclude the statements tended to harm its reputation, and any evidence to the contrary is not so

overwhelming that the finding can be considered manifestly wrong or unjust. We overrule Appellants' first issue.

Because the jury's answers to Questions 1 through 3 are supported by legally and factually sufficient evidence, we need not consider Montgomery Chandler's alternative theory of recovery submitted by way of Question 4.

*Scope of Employment*

In their second issue, Appellants argue the evidence is legally and factually insufficient to support the jury's finding that Currie was acting in the course and scope of his employment for IPM when he wrote and published the Coincrime.org blog. In answer to Question 7, the jury found Currie was an employee of Jepson-Bluhm, doing business as IPM. In answer to Question 8, the jury found that "[O]n the occasions in question…Currie [was] acting in the scope of his employment[.]" An instruction accompanying Question 8 instructed the jury "An employee is acting in the scope of employment if he is acting in the furtherance of the business of his employer."

Appellants did not object to Question 8, nor to its accompanying instruction, nor did Appellants request any other definitions or instructions regarding scope of employment. Therefore, the court's charge controls our analysis of whether the evidence is legally and factually sufficient to support the jury's affirmative answer.

28

*See Osterberg*, 12 S.W.3d at 55; *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016) ("Even if another legal theory was argued to the jury and explained by the lawyers in argument, we are bound by the instructions given to the jury [regarding the definition of 'employee'] and presume that the jury followed those instructions.").

Appellants do not dispute that Currie was IPM's employee when performing work in his capacity as Chief Operating Officer and Chief Information Officer. Instead, relying on *Minyard Food Stores v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002), and *Smith v. M Sys. Food Stores, Inc.*, 297 S.W.2d 112, 114 (Tex. 1957), Appellants argue that in order to be within the scope of employment, an employee's acts "must be of the same general nature as the conduct authorized or incidental to the conduct authorized" and that "if an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation."

In *Minyard*, the Texas Supreme Court reconciled the "general authority" standard set forth in *Smith*, 297 S.W.2d at 114, and *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971), with the "duty owing by the agent" standard set forth in *Texam Oil Corp. v. Poynor*, 436 S.W.2d 129, 130 (Tex. 1968), and distilled the scope-of-employment standard in defamation cases as follows:

29

> [I]n the defamation context, establishing that an employee was acting in the course and scope of his employment – or, in *Poyner's* words, making defamatory statements referable to a duty the agent owed to the corporation – requires evidence that the employee's statements were made in furtherance of the employer's business, and for the accomplishment of the objective for which the employee was employed.

*Minyard*, 80 S.W.3d at 578. Here, the court's charge included *Minyard's* language "in furtherance of the employer's business" but omitted "and for the accomplishment of the objective for which the employee was employed." But in the absence of an objection or a request in substantially correct language, the standard set forth in the charge, rather than the unsubmitted language from *Minyard*, controls our evaluation of the sufficiency of the evidence. *See* Tex. R. Civ. P. 278; *Seger*, 503 S.W.3d at 407; *Osterberg*, 12 S.W.3d at 55. Similarly, although Appellants correctly cite the deviation doctrine, we may not review whether the evidence establishes Currie "deviated from his employment [] when blogging about crimes related to the coin industry" as Appellants argue on appeal, because an instruction on deviation was neither submitted nor requested. *See* Tex. R. Civ. P. 278.

Accordingly, we limit our review to an evaluation of whether the evidence is legally and factually sufficient to support the jury's affirmative answer that Currie was "acting in the furtherance of the business of his employer" on the occasions in question.

When IPM was purchased by Jepson-Bluhm in 2013, it hired Currie as its chief operating officer and chief information officer, and he remained in those positions through the time of trial. Currie testified that he used the "fake name Rod Golden[,]" to create email accounts, "rodgoldentx@gmail" and "adjmcloon@gmail" under which he signed up for his competitors' newsletters so he could "understand what products they're marketing and at what prices." According to Paul Brown, who investigated digital evidence on behalf of Montgomery Chandler, adjmcloon@gmail was listed as the recovery email for the rodgoldentx@gmail account, and rodgoldentx@gmail was listed as the recovery email for the coincrimedotorg@gmail account which Currie used to send emails containing the Coincrime.org article about Montgomery Chandler. Currie agreed he used the "adjmcloon" and "rodgoldentx" accounts when "setting up the Google account that's used to carry out this scheme[.]" Cyber Investigation Services' report, which was admitted without objection as Exhibit 19, indicates that when "adjmcloon" and "rodgoldentx" opted-in as subscribers to Montgomery Chandler's email blasts, their email addresses were confirmed from IPM's IP address. Paul Brown explained:

> Basically what takes place is let's say you're on your phone or your laptop or a computer in your office and it wants to get on the internal network, the first thing it's going to do is basically send out a message that says, hey, I need an address and that's not the technical term, but suffice to say, that's what's taking place. And then what happens is there's a server out there that actually offers up an IP address. If it's on

31

the inside of a corporation, normally that's a private IP address. That private address is then leased to that computer or that phone or whatever, and then that IP address communicates to a router somewhere that will connect it to a public IP address that gets you on the internet.

Based on Exhibit 19, Paul Brown testified the IP address in question was leased to IPM, and the contact person for the IP address was Nathan Currie with an email address of nathan@preciousmetals.com. Paul Brown also testified that when Currie created and registered the Coincrime.org website with GoDaddy on December 12, 2017, he did so using IPM's IP address. A copy of GoDaddy's business records was admitted without objection as Exhibit 16, and these records include documents related to the registration of the Coincrime.org domain on December 12, 2017, along with a receipt with the same date, for Currie's registration of a domain name using IPM's IP address and the "adjmcloon" email address. Paul Brown testified that in order for internet activity to pass through IPM's IP address, Currie must have been "inside the company[,]" and if he was not physically in the office he would have to have been using some type of connectivity software, but when Currie's laptop was examined, no such software was found.

According to Exhibit 19, the blog about Montgomery Chandler was posted on Coincrime.org on January 31, 2018, and an email with a copy of the blog post was sent from the "coincrimedotorg" email address to Coincrime.org's subscribers on February 2, 2018. Currie testified other emails were automatically sent by Google's

software in batches throughout the month of February. Paul Brown testified Google's records showed somebody logged into the "coincrimedotorg" email account using IPM's IP address on February 13, 2018. Based on information obtained from Google (a copy of which was admitted without objection as Exhibit 17), Cook testified the email in question was sent to 1,383 email addresses, 64% of which were Montgomery Chandler clients.

As part of his investigation, Paul Brown conducted a forensic examination of Currie's laptop. He testified the examination revealed that the laptop's user name had been changed from "IPM_4400" to "Nathan" seven days before it was turned over for examination, one of the laptop's two hard drives was malfunctioning such that no meaningful data was retrievable from that hard drive, and 50% of the data on the functioning hard drive had been overwritten in the preceding two months, including 33% overwritten in one day, approximately a month before the laptop was turned over. The jury was instructed:

INSTRUCTION NO. 1

In this case after the lawsuit was filed, Nathan Currie overwrote 50% of the data contained on the hard drive of the Dell laptop computer used by Nathan Currie to send the e-mails to clients of Montgomery Chandler. The Court has found that Nathan Currie failed to preserve this evidence and, as such, his failure prejudices Montgomery Chandler and that Montgomery Chandler is irreparably deprived of having meaningful ability to present a portion of its claim.

33

You are instructed that you may consider that such evidence Nathan Currie destroyed or non-preserved would have been unfavorable to Nathan Currie.

## INSTRUCTION NO. 2

A fact may be established by direct or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by a witness who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

Currie denied Jepson's knowledge or involvement and testified he was at his house when he "made up" the Coincrime.org article. But the jurors, as "the sole judges of the credibility of the witnesses and the weight to give their testimony" were free to believe or disbelieve Currie, and we, as a reviewing court, "cannot impose [our] own opinion[] to the contrary." *City of Keller*, 168 S.W.3d at 819. A reasonable factfinder could reasonably infer from the evidence that Currie was using a laptop belonging to IPM and was either at IPM's office or using remote connectivity software, when he created the Coincrime.org website, when he registered its domain with GoDaddy, when he authored the Coincrime.org article, and when he used the "coincrimedotorg" email address to publish the article to 1,383 subscribers, 64% of whom were clients of Montgomery Chandler. The jury could also reasonably infer from the evidence that after the lawsuit was filed, Currie took steps to cover his tracks before turning the laptop over to Montgomery Chandler's

34

legal team for forensic examination. Although Jepson testified he neither was aware of nor authorized Currie's activities, he agreed that he hadn't "done anything to Nathan Currie about it" and that Currie still maintained his positions as COO and CIO at the time of trial. In light of the language in the court's charge, our sufficiency review does not require evidence that Jepson or IPM was aware of or authorized publication of the Coincrime.org article, only that Currie was "acting in the furtherance of the business of [IPM]."

In *Minyard*, the Texas Supreme Court found there was "no evidence to support an inference that Heflin's defamatory statements… were in furtherance of Minyard's benefit," because "the evidence show[ed] only that Heflin lied *to* Minyard and not that Heflin lied *for* Minyard." *Minyard*, 80 S.W.3d at 579 (emphasis in original) ("[T]here is a critical distinction between defaming someone to one's employer and defaming someone for one's employer."). Here, there was evidence to support an inference that Currie's statements were made for IPM's benefit. The jury heard testimony that IPM and Montgomery Chandler are direct competitors in the coin and precious metals business in Silsbee, Texas. Cook testified she helped launch IPM with her then-husband before they divorced and she began competing with IPM as the sole owner and president of Montgomery Chandler. She testified both companies used the same business model which included direct mail, email blasts and a sales

team who contact people on a customer list. Cook testified that while she was at IPM, she and her then-husband compiled a list of over 30,000 customers, and when she left in 2006, she still possessed the list and began using it in Montgomery Chandler's business. As a result, both companies used essentially the same list of customers. Cook testified that avoiding a bad review is "the biggest thing about coin companies… Everything is extremely confidential, privacy. That's why they buy precious metals." In evaluating whether Currie was acting "in furtherance of" IPM's business when he published the Coincrime.org article, a reasonable factfinder could infer from this evidence that that he "lied *for*" IPM, because IPM would stand to benefit from Montgomery Chandler's involvement in a scandal, especially one "raising ethical concerns." *See Minyard*, 80 S.W.3d at 579 (emphasis in original).

We conclude the evidence is legally and factually sufficient to support the jury's affirmative answers regarding IPM's respondeat superior liability. Accordingly, we overrule Appellants' second issue.

*Actual Damages*

In their third issue, Appellants argue the evidence is legally and factually insufficient to support the jury's award of $81,000 for damage to Montgomery Chandler's reputation in the past.

We begin by acknowledging that there are two types of defamation claims: defamation per se and defamation per quod. *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013). A party who establishes defamation per se is not required to prove actual damages, because statements that are defamatory per se "are so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish." *Id*. at 63-64. However, "this presumption yields only nominal damages." *Burbage*, 447 S.W.3d at 259. The Texas Supreme Court has defined "nominal damages" as a "trifling sum," noting that awards of nominal damages are usually $1 and sometimes $10 or $100, but that "$1,000 hardly falls in that category." *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 665 (Tex. 2009). A defamation per se plaintiff has the option to seek actual damages, but if he does so, "he must present evidence of the existence and amount of these damages." *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017). Even when damages are presumed, any award beyond a nominal amount is subject to review for evidentiary support. *Burbage*, 447 S.W.3d at 259.

"Defamation per quod, on the other hand, is 'defamation that either (1) is not apparent but is proved by extrinsic evidence showing its injurious meaning, or (2) is apparent but not a statement that is actionable per se.'" *Innovative Block of South Texas, Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 418 (Tex. 2020). In a

37

claim for defamation per quod, damages are not presumed and nominal damages are not available. *Brady*, 515 S.W.3d at 886. "[A]ny amount of damages for defamation per quod must be supported by evidence." *Innovative Block*, 603 S.W.3d at 423. "Absent evidence of actual damages in a case of defamation per quod, judgment should be rendered for the defendant." *Brady*, 515 S.W.3d at 886.

In summary, a plaintiff who seeks actual damages for defamation, whether per se or per quod, must prove the existence and amount of actual damages sustained as a result of the defamation, and when an award of actual damages is challenged on appeal, it is "imperative that appellate courts determine whether any evidence supports the *amount* of jury damages." *Burbage*, 447 S.W.3d at 259 (emphasis in original). Because IPM challenges the actual damages awarded to Montgomery Chandler, we need not determine whether the statements in question were defamatory per se or per quod; either way, the evidence must be legally and factually sufficient to support the existence and amount of actual damages awarded.

"Evidence that the plaintiff has lost a job or business opportunities may be evidence of loss of reputation, but only if it is connected to the defamatory statements." *Anderson v. Durant*, 550 S.W.3d 605, 621 (Tex. 2018). Damage to the plaintiff's reputation must be "more than theoretical." *Brady*, 515 S.W.3d at 887. In *Brady*, the Texas Supreme Court cited language in *Burbage* for the proposition that

"there must be evidence that people believed the statements and the plaintiff's reputation was actually affected." *Brady*, 515 S.W.3d at 887 (citing *Burbage*, 447 S.W.3d at 261-62). The Court nevertheless held that the evidence was legally sufficient to support the jury's award of $30,000 in damages for loss of reputation where the testimony indicated that a reader of a newspaper article was "concerned" about the statements made in article. *Id*. The article at issue in *Brady* chronicled various interactions between law enforcement officers and Wade Brady, the son of the Chief Deputy in the Fort Bend County Sherriff's Office. The Court, distinguishing *Burbage* and *Hancock* in which the evidence was held to have been insufficient, reasoned:

> But Wade's case is different. He worked for a company that installed decals on the county's patrol cars. *The sheriff testified that after the article appeared, Wade's employer contacted him with concerns about the article.* Although the sheriff assured Wade's employer that the company's contract with the county was "safe," the sheriff's testimony demonstrates that the employer was specifically concerned about Klentzman's report. *Shortly after these concerns arose, Wade was asked to quit.* Thus, at least some evidence suggests Wade was asked to quit because of the article, and this "serve[s] as proof for loss of reputation." Wade later resumed work at the same business, but this does not change that he presented evidence of the article's previous injury to his reputation.
>
> That some people thought less of Wade after the article was published and *that his employer asked him to quit his job shortly after reading the article is evidence of damages for loss of reputation.*

*Id*. at 887-88 (emphasis added) (citing *Hancock*, 400 S.W.3d at 71).

39

The following year in *Anderson*, the Court held the evidence was legally sufficient to support damages for loss of reputation where the recipient of the defamatory statement was unsure what to believe:

> Here, Anderson relies on testimony from a prospective employer, Jason Hiley, that he would not hire Anderson due to the illegal-kickback allegations. Hiley testified that before hearing about Anderson's alleged malfeasance, he believed Anderson "was a really good guy and had a really good reputation." On the issue of whether Anderson's reputation changed as a result of the kickback rumors, Hiley testified:
>
>> I mean, other than a -- other than the rumor that's out there, you know. You know, obviously . . . that would weigh on my mind a little bit. But, no, I think he's -- I think he's a good guy.
>
> But when asked why he did not hire Anderson, Hiley testified that it was, in part, due to the rumors:
>
>> Well, obviously, I mean I heard some -- heard some rumors after the fact . . . . But there was about a two-week period where we didn't visit at all. And, you know, I had heard that there were some—there was more to the reason that they didn't—that they parted company and so I just didn't take it any further. I had already been talking to [another job candidate] as well and we were already pretty far down the road.
>
> Hiley also said he would only consider interviewing and hiring Anderson for a future position if he "knew what the outcome of the rumors were."
>
> This testimony constitutes more than a scintilla of evidence that the kickback allegations damaged Anderson's reputation. Hiley's opinion of Anderson changed to the point that he would not consider Anderson for any position unless his name were cleared. This evidence is not merely hypothetical or speculative, but directly reflects Hiley's opinion about Anderson's character. We do not require conclusive proof that Anderson would have been hired but for the defamatory statements

but rather a reasonable inference that Anderson's reputation changed for the worse. This evidence is enough to cross the legal-sufficiency threshold regarding the existence of reputation damages.

*Anderson*, 550 S.W.3d at 622-23.

Montgomery Chandler sought to establish lost profits through Cook's testimony that orders or sales were cancelled as a result of the Coincrime.org article. Although the jury did not award damages for lost profits, this type of evidence may "also serve as proof for loss of reputation." *Hancock*, 400 S.W.3d at 71; *see Brady*, 515 S.W.3d at 887. Without objection, Exhibit 7 containing printouts showing "Sales by Customer Detail" was admitted. Based in part on the information contained in Exhibit 7, Cook testified about a client named Ratliff whose purchases from Montgomery Chandler were "[e]xtremely consistent[,]" totaling more than $1.6 million from 2010 to 2017. Cook testified that Ratliff's last purchase from Montgomery Chandler was approximately one month before the Coincrime.org article was published, that according to the Google documentation, he would have "received one of the e-mails sent out by IPM[,]" and that he never purchased from Montgomery Chandler again but did buy coins from other people before he passed away in 2019. Without objection, Cook testified:

Q. Did you attempt to speak to Mr. Ratliff about why he stopped purchasing?

A. I did attempt to speak to him. He spoke to my -- his -- his sales representative, said he didn't want to do business anymore, heard some bad news about us.

Cook also testified about a customer named Kibblehouse whose purchases from Montgomery Chandler totaled $205,000. Exhibit 7 revealed all but $9,700 of those purchases occurred between March 2015 and December 2017, which was about six weeks before the article's publication. Cook testified Kibblehouse was on the Google list and would have received an email. Cook explained Kibblehouse's only other purchase was in November 2018 when he bought the last two sets of a collection he had been working on and which he had to buy from Montogomery Chandler since it was the only dealer carrying that coin label. Cook then testified as follows:

Q. Why do you believe he stopped purchasing from Montgomery Chandler?

A. He told his sales representative because of bad news. Sorry.

MR. MALLEY: They're going to have to work it in, I guess, with opening a question with hearsay. I'm late.

THE COURT: Sustained.

Q. (BY MR. DYKEMAN) What is your understanding --

MR. DYKEMAN: I'm sorry, your Honor.

THE COURT: That's all right.

Q. (BY MR. DYKEMAN) What is your understanding of why Mr. Kibblehouse ceased purchasing from Montgomery Chandler?

42

A. My understanding is he received the e-mail.

Although the hearsay objection was sustained, the court was not asked to, and did not, instruct the jury to disregard this testimony. Cook testified about other customers who stopped ordering or who canceled orders, and we agree with Appellants that some of that testimony was speculative, and some was impeached with other evidence about the cancelations. But Cook's testimony that two major clients stopped doing business with Montgomery Chandler shortly after the Coincrime.org article was published and told their sales representatives that they did so because they heard bad news about Montgomery Chandler stands unimpeached and constitutes legally and factually sufficient evidence that Montgomery Chandler's reputation was damaged by the Coincrime.org article.

Next, we must evaluate whether the evidence is sufficient to support the amount the jury awarded. In Question 9, the jury was asked to find the amount that would fairly and reasonably compensate Montgomery Chandler for net lost profits, injury to reputation in the past, and injury to reputation in the future, with separate blanks for each answer. Cook testified Montgomery Chandler lost clients and sales, and she calculated lost profits of approximately $74,500. As noted above, evidence of lost business opportunities may serve as evidence of lost profits as well as loss of reputation. *Hancock*, 400 S.W.3d at 71; *see Brady*, 515 S.W.3d at 887. When

43

multiple elements of damages depend on "overlapping evidence," we are instructed to "consider all the evidence that bears on [the challenged] category of damages, even if the evidence also relates to another category of damages." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 773 (Tex. 2003).

The jury was instructed, "Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any." The jury did not award any amount for lost profits but did award $81,000 for loss of reputation in the past. The jury may have awarded nothing for lost profits because it was unpersuaded by Cook's calculations. Or, based on overlapping evidence, the jury may have found that the injury to Montgomery Chandler's reputation went somewhat beyond the amount of its lost profits, and, faithfully following the court's instruction not to award the same damages twice, chose to award all such damages as injury to reputation, rather than awarding some for lost profits and some for loss of reputation. The record supports either possibility, and we will not substitute our judgment for that of the jury. *See, Golden Eagle Archery*, 116 S.W.3d at 770 ("The jury in this case could have compensated Jackson for loss of enjoyment of life as part of physical pain and mental anguish, or disfigurement, or divided compensation in some manner between the two categories. The jury charge permitted the jury to

44

make its own determination of how to categorize and compensate the losses suffered by Jackson.").

Reputational damages are "incapable of precise mathematical measure[,]" and "the jury must be given some latitude." *Brady*, 515 S.W.3d at 887. "Evidence assigning an actual dollar value to the injury is not required; rather, reasonable compensation is the touchstone for quantifying damages." *Anderson*, 550 S.W.3d at 621. On this record, we do not consider $81,000 for loss of reputation to be "substantially higher than amounts awarded in equally or more egregious cases." *See id.* at 623, n. 93 (citing *Brady* as an example where the Court upheld an award of $30,000 for the defendant's portrayal of the plaintiff as "unruly and intoxicated" and benefitting from his father's position as a sheriff's deputy, and *Cullum v. White*, 399 S.W.3d 173, 182-86 (Tex. App.—San Antonio 2011, pet. denied), as an example where an award of $50,000 was upheld based on libelous statements by a ranch's former employee that the ranch's owner was involved in various crimes). We conclude the evidence is legally and factually sufficient to support the existence and the amount of actual damages awarded by the jury. We overrule Appellants' third issue.

*Exemplary Damages*

In their fourth issue, Appellants argue the jury's award of $320,000, which was reduced to the statutory cap of $200,000, must be reversed because there can be no exemplary damages in the absence of actual damages. Because we have concluded the evidence is legally sufficient to support the jury's award of actual damages, we overrule Appellants' fourth issue.

*Hearsay*

In their fifth issue, Appellants assert the trial court erred in overruling their hearsay objections to Exhibit 4 which consists of copies of emails received by Montgomery Chandler from three customers after they received the Coincrime.org article via email from coincrimedotorg@gmail.com. According to the exhibit, a customer named Chung forwarded a copy of the article to Michael Brown and wrote, "Mike, Call me when you see this.i need the full scoop from u and the owner of company[.]" An email from a customer named Schultz forwarded a copy of the article to Michael Brown and asked "what gives?" A customer named Haak forwarded a copy of the article and wrote, "I guess you knew about this…. One thing I don't understand, how could an 18 year old be a sales director…. Here's a quote from the article. Maybe '18 year old' is a typo."

Although Appellants objected to Exhibit 4, they did not object or request a running objection to a series of questions and answers about the exhibit, nor did they object each time similar evidence was offered. A trial court's erroneous admission of evidence "is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004); *see* Tex. R. App. P. 44.1(a) (a trial court's judgment will not be reversed on appeal unless the error complained of "probably caused the rendition of an improper judgment[.]"). "We review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007).

As noted above, there was no objection to Cook's testimony that one of Montgomery Chandler's major clients, Ratliff, told his sales representative that he no longer wanted to do business with Montgomery Chandler because he heard some bad news about them. Although Appellants objected after Cook provided similar testimony about another significant client, Kibblehouse, and although the objection was sustained, no instruction to disregard was requested or provided, and the witness was then allowed, without objection, to testify that it was her "understanding" that Kibblehouse stopped doing business with Montgomery Chandler because he had

47

received the email. Having reviewed the entire record, we conclude the judgment did not turn on the admission of Exhibit 4, and any error in admitting the exhibit was, therefore, harmless. We overrule Appellants' fifth issue.

*Spoliation Instruction*

In their sixth issue, Appellants complain that the trial court erred by including a spoliation instructing in the charge. The charge included an instruction that Currie destroyed or failed to preserve evidence that was presumably unfavorable to him because 50% of the data on the hard drive of his laptop had been overwritten. "A spoliation instruction may be given when a party has deliberately destroyed relevant evidence." *Cire v. Cummings*, 134 S.W.3d 835, 843 (Tex. 2004). "We review a trial court's imposition of a spoliation remedy, including the submission of a spoliation instruction to the jury, for an abuse of discretion." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). "The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but 'whether the court acted without reference to any guiding rules and principles.'" *Cire*, 134 S.W.3d at 838-39 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)).

The record reveals that on March 6, 2018, approximately one month after Currie began emailing the Coincrime.org article in batches of emails originating

48

from the coincrimedotorg@gmail.com account, Montgomery Chandler's counsel sent Appellants' counsel a letter notifying them of its defamation claim and requesting Currie, Jepson and IPM to preserve electronic information stored on their computers relevant to the claim, including information pertaining to the "rodgoldentx," "adjmcloon," and "coincrimedotorg" email accounts, the Coincrime.org website, and any communications between Jepson and Currie relating to the website or Michael Brown's murder conviction. The letter specifically requested that Currie, Jepson and IPM refrain from certain operations, such as overwriting data, that cause a loss of potentially relevant information. On September 13, 2018, Montgomery Chandler's counsel sent Appellants' counsel a letter requesting an opportunity to access and forensically inspect Currie's computers and repeating its request that electronic information be preserved. On November 21, 2018, IPM's counsel notified Montgomery Chandler's counsel that Currie's laptop could be picked up on November 26, 2018, at which time it was picked up and delivered to Paul Brown for inspection.

On May 31, 2019, the trial court held a hearing on Montgomery Chandler's Amended Motion for Finding of Spoliation and Motion for Sanctions in which Montgomery Chandler alleged, "Currie scrubbed, overwrote or deleted" information from the laptop before turning it over for inspection. Currie's counsel attended the

49

hearing, but Currie did not. Paul Brown testified for Montgomery Chandler, and his testimony at the hearing was largely the same as his subsequent testimony at trial. He testified that the username for the laptop was changed from "IPM_4400" to "Nathan" the day before IPM's counsel notified Montgomery Chandler's counsel that the laptop was available for inspection. He also testified that one of the laptop's hard drives was malfunctioning and fifty percent of the data on the other hard drive had been overwritten in the two months leading up to the laptop's being produced for inspection. According to Paul Brown, much of the new data consisted of music files, but "we don't know that it was music files that was written over. We don't know what was there prior to being written over." When he conducted searches for "rodgoldentx," "coincrime," and "coincrimedotorg" on the laptop, the search yielded no hits.

On appeal, Appellants argue Montgomery Chandler was not harmed by the overwriting of the laptop's data because Google's records supplied Montgomery Chandler with all the data it needed to determine who received the Coincrime.org article via email from coincrimedotorg@gmail.com. But the trial involved issues other than the identity of the article's recipients, such as whether Currie was acting on behalf of IPM when he published the article and dispersed it through emails. Paul Brown testified:

Q. Okay. So, do we have any way of knowing what was on this drive before Mr. Currie overwrote or modified these files?

A. Well, when you say on this drive --

Q. Or on the computer.

A. On this computer we know some of the things that were there prior. What we don't know is what was there underneath, if you will, where these files were written to. We don't know if there was anything there or not.

Q. So, if something had previously been deleted underneath these new files, we have no way of knowing what was there --

A. That --

Q. -- what was deleted?

A. That is correct.

. . .

Q. … [W]hatever data existed in that location on the drive prior to all this activity is irrecoverable?

A. That is correct.

At the conclusion of the hearing, the trial court announced its ruling in favor

of Montgomery Chandler, explaining:

[W]hat I see here is a deliberate attempt to first circumvent a preservation letter after his lawyer told him you got to preserve everything on here.…He is the information officer, and he works on -- he does the computers. So, he knows. He's not a layman[.] He knows that anything he does to over -- you know, write music down is going to overwrite it. He knows that but he did it anyway and then he changed the username right before and he knew that was going to be discoverable. So, why he did it, I don't know; or maybe he thought that wouldn't show. I don't know, but clearly this is not an accident. This is

51

not negligence. He purposely changed that computer. I don't know what was overwritten. None of us do[.]

"Under an abuse of discretion standard, we defer 'to the trial court's factual determinations if they are supported by evidence,' but review legal determinations de novo." *Haedge v. Cent. Tex. Cattlemen's Ass'n*, 603 S.W.3d 824, 827 (Tex. 2020) (quoting *Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011)). Giving due deference to the trial court's factual determinations, we cannot conclude the trial court acted arbitrarily or unreasonably, nor that it failed to follow guiding principles. Appellants' sixth issue is overruled.

Conclusion

Having overruled all of Appellants' issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS<br>Justice

Submitted on January 24, 2025
Opinion Delivered October 23, 2025

Before Golemon, C.J., Wright and Chambers, JJ.